[Filed May 17, 1887.]

# STATE OF OREGON, RESPONDENT, *v.* ILLIS ROBERTS, APPELLANT.

EVIDENCE — ADMISSIBILITY OF — WHEN FACTS CONSTITUTED PART OF THE CRIMINAL ACT, THOUGH THEY MAY EVEN TEND TO PROVE ANOTHER CRIME. — The evidence offered tended to prove that the powder and fuse used to burn the barn were obtained from the powder-house of a third person. *Held*, that it was competent to prove all the facts, though in doing so the evidence offered tended to prove another crime; but that in this particular case the evidence offered did not necessarily tend to prove another crime.

CONSPIRACY — ACTS AND DECLARATIONS OF CONSPIRATORS. — After proof of a conspiracy, or agreement to commit a crime, all that was said or done by any of the conspirators in furtherance of the unlawful purpose may be introduced in evidence upon the trial of all or either of them.

INSTRUCTIONS BY THE COURT — PROVINCE OF THE JURY. — The court did not err in refusing to tell the jury that proof by the defendant of one single fact by a preponderance of the evidence, inconsistent with the defendant's guilt, is sufficient to raise a reasonable doubt, and the jury should acquit the defendant. In such case, it is the province of the jury to determine the effect of the evidence, and this right cannot be influenced or controlled by the court.

REASONABLE DOUBT — DEFINITION OF. — The court defined a reasonable doubt as follows: "A reasonable doubt is not every doubt; it is not a captious doubt. It is such a condition of mind resulting from the consideration of the evidence before you as makes it impossible for you, as reasonable men, to arrive at a satisfactory conclusion. It is not a consciousness that a conclusion arrived at may possibly be erroneous, but such a state of mind as deprives you of the ability to reach a conclusion that is satisfactory." *Held*, not error.

REFUSAL TO CHARGE — WHEN NOT ERROR. — The instruction asked by the defendant on the subject of reasonable doubt contained a correct statement of the law, and ought to have been given; but inasmuch as the ground was fully covered by the instruction given by the court on its own motion, on the same subject, *held*, that the error did not prejudice the defendant.

ACCOMPLICE — WHO IS NOT. — A person who did not counsel, aid, or abet, or in any manner participate in the commission of a crime, and whose only knowledge of the facts was derived from what she saw and heard at her husband's house, who was one of the parties implicated, is not an accomplice.

DEFENDANT'S INTENT—INSTRUCTION. — The indictment charged the defendant with having wilfully, maliciously, and unlawfully set fire to and burned W. S. L.'s barn. The defendant asked the court to tell the jury that if defendant set fire to a hay-stack near the barn with a malicious, wilful, and unlawful intent, and by that means the barn was burned, that he must be acquitted. This the court refused; *held,* not error. It was the province of the jury to say with what intent the hay-stack was fired, and if it was fired as a means or with the intent to burn the barn, the defendant's guilt would be the same as if he had actually applied the torch to the barn.

NEW TRIAL—REFUSAL TO GRANT, NOT REVIEWABLE. — Under the Code of Criminal Procedure the refusal of the trial court to grant a new trial is not reviewable on appeal.

APPEAL from Multnomah County.

*John Burnett,* and *A. Lenhart,* for Appellant.

*N. D. Simon,* for Respondent.

STRAHAN, J. — On the fifteenth day of February, 1887, the grand jury of Multnomah County returned into the Circuit Court of that county an indictment against the defendant, charging him with the crime of arson. The charging part of said indictment is as follows: —

"The said Illis Roberts, on the thirtieth day of July, A. D. 1886, in the county of Multnomah, and State of Oregon, did wilfully, maliciously, unlawfully, and feloniously set fire to and burn in the night-time a barn of another, namely, the barn of W. S. Ladd, situated in the county of Multnomah, and State of Oregon, with intent to injure thereby the said W. S. Ladd."

The testimony offered upon the trial tended to prove that the defendant and Robert A. Burnys and Charles Gale conspired together in the month of July, 1886, for the purpose of burning this barn. Their reason for doing so was, as stated by the defendant Roberts, that "Ladd had no business to hire Chinamen." Burnys pleaded guilty to an indictment for the same offense, and was sentenced to imprisonment for five years. This defendant, after a trial before a jury, was found guilty and sentenced to be punished by imprisonment for six years, from which judgment he has appealed to this court.

This case is one of considerable importance, and the rulings of the court below cannot be properly understood without a pretty

full statement of the evidence given upon the trial. Mrs. Almira Burnys was the first witness on the part of the State, and she testified as follows: "My name is Almira Burnys. I am the wife of Robert Burnys, and we lived on the section line road when the barn was burned. Roberts came to our house, and I heard him and Mr. Burnys talking about burning the barn. I knew two or three weeks before the barn was burned that they were going to burn it, and I told Mr. Burnys not to burn it. They went once, about two weeks before the barn was burned, to burn it, but didn't. The night before it was burned Roberts met Mr. Burnys at our house and said Gale was coming; but he didn't come, so they didn't do anything. The next day Roberts came to the house in the afternoon and said Gale would meet them at the lodge. They talked about burning the barn and I overheard them; they were in the front room while they were talking and I was in the kitchen. There is only a board partition between the rooms, and I could hear every word they said and see them through the cracks. They went away about seven o'clock; Mr. Burnys took some powder and fuse and I knew they were going to burn the barn. I don't think they thought I knew anything about it. It was not light at this time, and yet it was not dark. I saw them when they left. They went to the lodge and after it was out Mr. Burnys, Roberts, and Gale went to the barn."

"Question by defendant. How do you know they went to the barn?

"Answer. Mr. Burnys told me so when he came home, and all the knowledge I have is from conversations overheard by me between Burnys and Roberts.

"Q. Was Mr. Roberts present during the conversation?

"A. Yes, sir. Mr. Burnys told me that he and Roberts and Gale set it on fire with powder. I was watching the fire when he came home. The roof hadn't caught fire yet when he reached the house. He had his hat and coat and shoes off when he came in and had been running. He said he took off his shoes so no one could hear him come up the steps. I said, 'Robert, what did you burn that barn for?' and he said, 'You keep still; if

you ever say a word about it I will kill you.' Afterwards, I asked Roberts, 'What made you burn that barn?' and he said, 'That's all right, Ladd had no business to hire Chinamen.'"

"Question by District Attorney. Do you know where this powder that was used to burn the barn came from?

"Answer. It came from Beck's powder-house.

"Q. Do you know when it came from there?

"A. Yes, about a month before the fire.

"Q. Who brought it from Beck's powder-house?

"A. Mr. Burnys and Roberts.

"Q. What did they do with it?

"A. They buried it.

"Q. Where did they bury it?

"A. Under the house.

"Q. Do you know how much powder they took?

"A. They took two twenty-five-pound cans and several small ones.

"Q. Do you know what else they took?

"A. Yes, they got fuse.

"Q. Do you know where they got the fuse?

"A. Yes, from Beck's powder-house.

"Q. How much powder and stuff did they bury?

"A. All of it. The twenty-five-pound cans and the small ones.

"Q. Do you know where the twenty-five-pound can is now?

"A. Yes, I've got a plant in it.

"Q. Do you know where the powder is now?

"A. I showed it to the detectives, and they took it away."

On cross-examination the witness testified: "The first person I told about the burning of the barn was Mr. Ladd. He gave me ten dollars; that is all the money I have received from him; I told him about it about four weeks ago; it was just after Mr. Burnys and I had had a quarrel; the trouble was about my children; he put me out of doors, and I went with it, and I have not lived with him since; Mr. Arthur Kelly carried a letter from me to Mr. W. M. Ladd, which he opened and read; I told Mr. Ladd that I did not want to go to my grave with that secret in my possession without disclosing it."

Barry, a witness for the State, testified that he went to Burnys' house and searched the premises.

"Question.   Did you find any powder?

"Answer.   Yes.

"Q.   What powder did you find?

"A.   This twenty-five-pound can, and those small cans and fire-works."   (The cans of powder were then offered in evidence.)

Charles Gale, also a witness on the part of the State, testified substantially as follows:   "My name is Charles Gale; I live in East Portland; I have lived there about fifteen months; we burned the barn July 30, 1886; Burnys and Roberts and myself were present; Roberts planned the burning of the barn; I said to him when he first began talking about it, 'what's the use, it's fully insured, and Ladd won't lose anything.'   He said he would find out whether it was insured or not, and some time afterwards told me that it was not insured to amount to anything; after the lodge was over we three went together from the lodge and burned the barn; we climbed the fence and went through the field towards the barn; when we got nearly there I stopped; they told me to stay and watch; they went around on the east side of the barn, where there was a stack of hay; Roberts split the fuse so it could be lighted, and put the can of powder in the hay, and Burnys touched the match."

"Question.   Do you know where that powder came from?

"Answer.   Yes, it come from Beck's powder-house; I was not present when the powder was obtained, but Roberts and Burnys both told me that they got the powder there.

"Q.   Do you belong to the secret lodge of I. W. A.?

"A.   Yes.

"Q.   What principles do they advocate?

"A.   The opposite of the Knights of Labor.

"Q.   Did Mr. Roberts tell you anything about Mrs. Burnys; how he would keep her secret?

"A.   He said he would make her join the lodge and she would not dare to tell.

"Q.   What are the principles of the I. W. A.'s?

"A.   They are somewhat like the anarchists.

"Q. Is it not a fundamental principle that they will perjure themselves or do anything to help a member out, and is it not a fact that they threaten death to any one who divulges any of its secrets?

"A. Yes, that is what they will do."

Robert Burnys, after he had pleaded guilty to the indictment against him, and before he was sentenced, was also called as a witness on the part of the State, and testified in substance: "I know Gale and Roberts; I have known them eight or nine months; Roberts lived about a mile from me, and Gale about half a mile; I was at the lodge the night the barn was burned; either Gale or Roberts went from my house to the lodge with me; I don't know which it was; we had arranged to burn the barn that night."

"Question. Did you ever make an attempt before?

"Answer. Yes, about two or three weeks before this we arranged to burn it; we all went by the barn but saw the door open and passed on by; we thought some one was inside; there was generally a watchman around.

"Q. Where did you go after that?

"A. Roberts and I met at my house the evening before the barn was burned, but Gale didn't come so we put it off. The next night after lodge was out, Gale and Roberts and I went to burn the barn; when we reached the fence around the field in which the barn stands, we climbed over and lay down to listen if any one was about; we may have been there half an hour, and we may have lain an hour; I cannot tell; and not hearing anything, we went up to the barn; I had some powder and fuse and matches in my pockets; I gave them to Gale and Roberts; they went around between the barn and the hay-stack, and I stood off as guard; I did not see who set the fire; when they came out we started and ran; I cut through the fields towards my house; and Gale and Roberts started in the direction of theirs; my wife never told me not to burn the barn or opposed me in any way; I never threatened to kill her if she told.

"Q. Where did you get that powder you used to fire the barn with?

"A.   From Beck's powder-house.

"Q.   Who was with you?

"A.   Roberts.

"Q.   How did you get in?

"A.   We broke the lock.

"Q.   State whether you recognize that powder?   (Exhibiting powder in evidence.)

"A.   Yes, that's the powder we got.

"Q.   What did you do with it?

"A.   Took it down and hid it in some brush.

"Q.   You do not know how many cans you got?

"A.   We got two large twenty-five-pound cans and some small ones, I don't know how many, and some fuse; when we divided them I remember I had two cans more than Roberts.

"Q.   What did you do with that powder after taking it from Beck's house?

"A.   We took it first about two hundred yards from my house and hid it in the brush; then afterwards we got it and took it over to my house and buried it under my house; Gale and I took some of it afterwards to his place.

"Q.   Did Roberts tell you he was going to make Mrs. Burnys join the society to keep her from telling?

"A.   I think he did say something to that effect."

Captain Farrell, another witness on the part of the State, testified: "I am captain of police; about two or three days after Roberts was arrested, Gale was put into the cell to talk with him; I stood on the outside near the wall and could hear nearly everything that was said; they talked in whispers; the wall is made of thin boards and there are some small holes in it; you can hear a whisper; they kept rattling the straw mattress and I did not hear everything that Roberts said; I could hear everything that Gale said distinctly; Roberts said to Gale: 'It is singular you are put in here, what is the reason?' Gale told him there were some women in his cell and he was put in with him until they were removed.   Then I heard Roberts say: 'Don't give yourself away, and the I. W. A.'s will help us out; don't put any dependence in any lawyer the court will appoint;

we want our own lawyer; don't speak to any one about the case at all. Remember Shakspeare says: "A closed mouth catches no flies."'"

The foregoing was all the evidence in the case tending to connect the defendant with the crime charged.

A great number of exceptions were taken upon the trial upon the part of the defendant: (1) To the introduction of evidence on the part of the State; (2) to the giving of instructions by the court to the jury; and (3) to the refusal of the court to give instructions asked on the part of the defendant.

All of the evidence offered on the part of the State tending to prove a conspiracy between Burnys, Gale, and Roberts to commit the crime charged, and all the evidence tending to prove the preparations for its commission, was objected to on the part of the defendant, but his objections were overruled, to which ruling exceptions were duly taken. Upon the argument here the objections to the evidence tending to prove the conspiracy were not insisted upon, and must, therefore, be deemed waived or abandoned. The principal objection to the other evidence was its incompetency, for the reason it tended to prove the commission of another crime.

1. A somewhat careful review of the evidence satisfies us that this objection is not well taken. The obtaining of powder from Beck's powder-house, considered by itself, is not a crime; nor was the breaking of the lock for that purpose necessarily and under all circumstances criminal. It does not distinctly appear whether their acts were with or without Beck's knowledge or consent, nor does it appear that they were done with a felonious intent. The presumption is that these acts were innocent and lawful until their criminality is made to appear, that is, with what intent they were done, and we cannot, for the purpose of reversing this judgment, presume they were criminal. But admitting that the taking of the powder was larceny, and the breaking of the lock and the entry into the house for that purpose was burglary, we have no doubt but that the evidence was competent. It was the preparation of the means to commit the particular crime for which the appellant stands indicted, and the

two transactions are so connected together, that one cannot be shown without proof of the other. The inception of this crime was the conspiracy between Burnys, Gale, and the defendant, to burn the barn in question. After that agreement had been made between these parties, whatever any or either of them did or said thereafter in furtherance of the conspiracy is competent evidence against any or all of them. The procuring of the powder and fuse as a means to accomplish the end, no difference when or how procured, is a fact, which the State had a right to submit to the jury as one of the circumstances of the alleged crime, to be weighed and considered by them for whatever they might deem it worth. It was a part of the preparation to com-\* mit a contemplated crime, and as a fact to be proven on the trial of the defendant for the commission of that crime, it stands on the same principle as the procuring of a deadly weapon, poison, or other means to commit murder, or the preparation of dies or plates to counterfeit the coin or currency of the country, or the preparation of the tools or implements or means to commit burglary or any other crime. All of the acts of the parties done in furtherance of the common design, though separated by time, and not continuous, constitute one entire transaction, and may be shown upon the trial.

2. The defendant's counsel asked the court to instruct the jury as follows: "If there is any one single fact proved to your satisfaction on the part of the defense, by a preponderance of evidence, which is inconsistent with the defendant's guilt, this is sufficient to raise a reasonable doubt, and you should acquit the defendant." This request was refused by the court, and, we think, properly. The objections to such an instruction are numerous. In such a case as this, when the evidence is direct and not circumstantial, the jury ought to weigh the entire evidence, and determine the defendant's guilt or innocence by the effect produced upon their minds from such general consideration of all the facts, and not from isolated, separate, or disjointed facts. In the next place, this instruction if it had been given by the court would have been an unwarranted invasion of the province of the jury by the court. It is not for the court to

say in any case, where there is any evidence tending to prove or disprove a particular fact, what its effect shall be, or what weight ought to be attached to it by the jury, or what shall be sufficient to raise a reasonable doubt in the minds of the jury. It is the peculiar and exclusive province of the jury to determine all such questions, and their right to do so cannot be influenced or in any manner controlled by the court. The court did not err, therefore, in refusing to give the instruction asked.

3. *Reasonable doubt.* The defendant's counsel also asked the court to give the jury the following instruction:—

"Reasonable doubt is not a mere possible doubt. It is that state of the case which, after an entire comparison and consideration of all the evidence, leaves your minds in such a condition that you cannot say you feel an abiding conviction, to a moral certainty, of the truth of the charge. It is not sufficient to establish a probability, though a strong one, arising from the doctrine of chances, that the fact charged is more likely to be true than the contrary; but the evidence must establish the truth of the fact to a moral certainty." This instruction was refused by the court, for the reason that the same had been, in effect, given by the court. The charge of the court on the subject of reasonable doubt was as follows: "A reasonable doubt is not every doubt; it is not a captious doubt. It is such a condition of mind resulting from the consideration of the evidence before you, as makes it impossible for you as reasonable men to arrive at a satisfactory conclusion. It is not a consciousness that a conclusion arrived at may possibly be erroneous; but such a state of mind as deprives you of the ability to reach a conclusion that is satisfactory."

The instruction asked by appellant is, in substance, the language of Chief Justice Shaw in *Commonw.* v. *Webster*, 5 Cush. 295, and is generally accepted as a concise definition of a reasonable doubt; but it is not the only definition of a reasonable doubt. Any phraseology which conveys to the minds of the jury, clearly, distinctly, and intelligibly, the same idea will be sufficient, and we think the charge given did this. The jury could not have been misled as to the degree of proof required to

convict under this charge; and unless they were misled, and by reason thereof convicted the defendant on less or weaker evidence than they ought, we cannot say there was error. We think, as a matter of practice in criminal cases, when the defense asks instructions which are free from legal objections, that they ought to be given, even though the general charge of the court may have covered the same ground; but in case of refusal, unless we can clearly see that the defendant was prejudiced by such refusal, the judgment will not be reversed.

4. *Evidence of accomplice.* The defendant also asked the court to instruct the jury as follows: —

"Mrs. Almira Burnys is an accomplice in this crime, charged against this defendant, as are also Charles Gale and Robert Burnys, and you cannot convict the defendant upon their testimony, unless it be corroborated by such other as, unaided by their testimony, tends to connect the defendant with the commission of said crime." This instruction was also refused, and the defendant excepted. The general rule of law, that to justify a conviction on the evidence of an accomplice his evidence must be corroborated, is not controverted. The Criminal Code, section 172, states it thus: "A conviction cannot be had upon the testimony of an accomplice unless he be corroborated by such other evidence as tends to connect the defendant with the commission of the crime, and the corroboration is not sufficient, if it merely shows the commission of the crime, or the circumstances of the commission." No conviction could be had on the uncorroborated testimony of Burnys and Gale. They were "accomplices" within the meaning of this section. Thus far the State and the defense agree; but the defense claims that Mrs. Burnys is an accomplice also. Webster defines accomplice to be an associate in crime; a partner or partaker in guilt. Burrill's Law Dictionary defines the term thus: "One of several concerned in a felony; an associate in crime; one who co-operates, aids, or assists in committing it." This term includes all the *particeps criminis,* whether considered in strict legal propriety as principals or accessories. And Wharton's Criminal Evidence, section 440, says: "An accomplice is a person who knowingly, voluntarily, and with

common intent with the principal offender, unites in the commission of a crime." And to the like effect is *Cross* v. *The People,* 47 Ill. 152; *Davidson* v. *State,* 33 Ala. 350.

Apply these definitions to the evidence, and tney make it too plain for argument that the appellant's exception is not well taken. Mrs. Burnys did not counsel, aid, or abet in any way; did not in any manner participate in the crime; and her knowledge of it was derived from the accident of being the wife of one of the criminals.

5. *Variance between indictment and proof.* The defendant's counsel also asked the court to give the jury the following instruction:—

" This indictment charges the defendant with having wilfully, maliciously, and unlawfully set fire to and burned W. S. Ladd's barn. If you find from the evidence beyond a reasonable doubt that this defendant set fire to and burned a stack of hay, although wilfully and maliciously and unlawfully, and although from it the barn caught fire and burned, it is a variance between the indictment and proof, and the defendant should be acquitted."

The court did not err in refusing to give this instruction. The defendant's motive and purpose in firing the hay were questions of fact for the jury; and the evidence offered tended very strongly to prove that the real purpose was to burn the barn, and the hay was fired as the readiest and quickest method of accomplishing that object. Under such circumstances there was no variance, and the court did right in refusing the instruction.

*Motion for a new trial cannot be reviewed.* The general charge of the court on the subject of accomplices as to Burnys and Gale, though excepted to at the trial, was not claimed to be erroneous here, and those exceptions must be deemed to be abandoned. The other exceptions are not available on this appeal, for the reason that the ruling of the trial court on a motion for a new trial cannot be assigned for error in this State. Our Code has made no provision for reviewing the ruling of the trial court on such motion, and therefore this court cannot examine the same. But if it were competent to do so it would not avail the defendant in this case, for the reason the jury is to judge of the weight and

effect of the evidence, and there can be no doubt in this case there was evidence which justified the jury in finding the verdict.

We have examined this case with care, for the reason the parties implicated seem to have gone directly from a lodge-room to the scene of the crime, and after discovery, they appear to have relied upon an order called the "I. W. A.'s" for help. And the evidence given upon the trial tended to show that parties concerned in its commission, with others, sought to bind themselves together by extrajudicial oaths, and by ties which they thought to make stronger than the law; but the result has demonstrated the futility of the attempt, and that the purposes of the law are not to be thwarted by such means. The real purposes of the organization, so far as they were disclosed upon the trial, are revolutionary and highly criminal. They assumed to act as self-appointed regulators, and to determine the propriety of the conduct of citizens of this State in the management of their private business, and to direct whom they *shall* and whom they shall *not* employ; for the right to determine who shall *not* be employed .implies the right to say who shall be. It reviews in secret the acts and conduct of the citizens, and its members emerge from the lodge-room and hasten away to execute private and summary vengeance upon those who have fallen under the ban of its displeasure. They attempt to prescribe a rule of civil conduct for the government of all the people of this State, unknown to our statutes, and at war with the idea of a government regulated by law, and to inflict punishment for a violation or a disregard of its behests. In this instance it was arson. The next may be murder. The spirit that incites the commission of that crime will not stop there. All human experience has demonstrated this. There is no half-way station between the benign control of the law and the wildest anarchy. If the commission of one crime does not bring the citizen to the feet of the lawless cabal, another must follow, and so on in gradual succession until the foundations of social order are broken up and the spirit of anarchy be enthroned in its stead. The object and direct tendency of such an organization cannot be too promptly condemned. They are at war with the law, our social and political life, and the genius

of our institutions. Such as organization is not of American birth, and cannot take root or flourish in an American commonwealth.

The views we have expressed on the rulings of the court below require an affirmance of the judgment.