Argued June 17, affirmed June 30, rehearing denied September 8, 1914.

# STATE *v.* PENDER.

## (142 Pac. 615.)

### Homicide—Trial—Question for Jury.

1. In a prosecution for murder, evidence *held* sufficient to authorize the case to be submitted to the jury under Section 183, L. O. L., providing that a cause not sufficient to be submitted to a jury is one where it appears that, if the verdict were for defendant, the court ought to set it aside for want of evidence.

### Criminal Law—Appeal—Review—Questions of Fact.

2. A motion for an instructed verdict is equivalent to a demurrer to the evidence, and a review thereof is governed by the rules applicable to a motion for nonsuit.

### Criminal Law—Demonstrative Evidence—Admissibility.

3. In a prosecution for murder, a revolver with which the evidence tended to show the crime was committed, a claw-hammer, bearing marks of having been used on a trunk where the revolver was found, the trunk, and a package and newspaper, which the evidence tended to show were taken to the place of the murder just before it occurred, were properly admitted in evidence.

### Homicide—Evidence—Relevancy.

4. In a prosecution for murder, evidence that a large number of men were working at logging camps near the place of the offense, and that a velocipede was stolen about the time of the murder, was properly excluded.

### Criminal Law—Review—Discretion of Trial Court—Refusal of New Trial.

5. Section 1626, L. O. L., providing that, after hearing an appeal, the Supreme Court must give judgment without regard to the decision of questions which were in the discretion of the court below, the Supreme Court cannot review the refusal of a new trial.

### Criminal Law—Appeal—Decisions—Review—Denial of New Trial.

6. Section 548, L. O. L., as amended in 1907 (Laws 1907, p. 313, § 6), allowing an appeal from an order setting aside a judgment and granting a new trial, does not make an order denying a new trial appealable, and does not apply to criminal actions.

### Criminal Law—Appeal—Harmless Error—Admission of Evidence.

7. Under Section 1626, L. O. L., requiring the Supreme Court to disregard technical errors, defects and exceptions, which do not affect the substantial rights of parties, where the testimony of a witness was nearly all immaterial, and the material facts were testified to by other witnesses or were not disputed, the admission of impeaching evidence to the effect that she was not married to the defendant at the time she testified she was is not ground for reversal.

Criminal Law—Trial—Remarks of Counsel.

8. In a prosecution for homicide, remarks of the district attorney that a witness for defendant owed his job to one of the attorneys for defendant, and that he had gone to Portland with the attorney and another of the attorney's clients that he just kept out of the penitentiary to do a little experimenting, though improper, were not grounds for reversal, since they did not state material facts tending to show the guilt of defendant.

From Columbia: JAMES A. EAKIN, Judge.

The defendant, John Arthur Pender, was convicted of murder in the first degree, and sentenced to be hanged, and appeals. The facts are stated in the opinion of the court. AFFIRMED. REHEARING DENIED.

For appellant there was a brief over the names of *Mr. John F. Logan, Mr. John A. Jeffrey, Mr. Charles E. Lenon* and *Mr. Lester W. Humphreys,* with oral arguments by *Mr. Logan* and *Mr. Jeffrey.*

For the State there was a brief over the names of *Mr. William B. Dillard,* District Attorney, *Mr. Andrew M. Crawford,* Attorney General, and *Mr. Edmund B. Tongue,* with oral arguments by *Mr. Dillard* and *Mr. Crawford.*

Department 2. MR. JUSTICE RAMSEY delivered the opinion of the court.

On the 17th day of October, 1911, the grand jury of Columbia County returned an indictment, charging the defendant, John Arthur Pender, with the commission of the crime of murder in the first degree, committed in said county on September 4, 1911, by the killing of Daisy Wehrmann. The defendant was arraigned, and pleaded not guilty. He was tried twice, and, on the first trial, the jury failed to agree upon a verdict, and were discharged. On the second trial the jury returned a verdict of guilty as charged in the indictment

on November 22, 1913. The defendant was allowed 30 days in which to file a motion for a new trial. The motion for a new trial was filed and argued by counsel on January 31, 1914, and taken under advisement by the court, and on February 9, 1914, the court denied said motion. On February 9, 1914, the trial court pronounced sentence upon the defendant, and adjudged that he be hanged. The defendant appeals and assigns six supposed errors, for which he asks that the judgment appealed from be reversed and a new trial granted.

There are 1,348 pages of evidence and many exhibits. We shall not attempt to give a summary of all of the evidence.

1. The first assignment is that the court erred in refusing to direct the jury, at the close of the evidence, to return a verdict of not guilty. In making this motion for a directed verdict, the counsel for the defendant based it upon the contention that there was not sufficient evidence to justify the court in submitting the case to the jury.

The first point for decision is whether there was sufficient evidence to justify the court in submitting the case to the jury. The motion for a directed verdict raises the same question that would have been raised by a motion for a judgment of nonsuit.

The evidence shows that the deceased, Daisy Wehrmann, with her four year old son, Harold, and her husband, Frank Wehrmann, resided in a little cabin about 3½ miles southwest of Scappoose, in Columbia County. Their little cabin was situated in a lonely place in the mountains, with no means of communication with the outside world, except a wagon road, which during a large portion of the time, was in bad condition.

About three quarters of a mile, in an easterly direction from their mountain home, is a small cabin belonging to Riley and Hassen, and near this last-mentioned cabin were the two tents of the defendant, in which he lived with his wife. The road between the Wehrmann cabin and the tents of the defendant and the cabin of Riley and Hassen is a mountain-way, winding among the hills, between these places. The Wehrmann cabin is near the top of the mountain.

The killing of Mrs. Wehrmann and her little boy, Harold, occurred probably on the evening or night of September 4, 1911. The bodies of Mrs. Wehrmann and her child were seen by Elizabeth Seirks and her daughter, through a window of the Wehrmann cabin, on the evening of September 5th and the morning of September 6th, lying on the bed; but the cabin was locked with a padlock, and they could not gain entrance. Mrs. Elizabeth Seirks notified the authorities of what she had seen through the window of the Wehrmann cabin on the morning of the 6th, and Sheriff A. E. Thompson and a deputy went to the cabin about 2 or 3 o'clock on Wednesday, the 6th of September, and found the Wehrmann cabin locked with a padlock, and forced the door open and entered the cabin. They found Mrs. Wehrmann and the little boy· dead, lying on the bed.

One bullet entered Mrs. Wehrmann's jawbone on the left side, an inch or two behind the point of the jaw, breaking the jawbone, passing through the root of the tongue and the ear, and coming out behind the right ear on the bone just behind the ear; another bullet went in on the left side above the tip of the same bone, behind the other ear; the third entered at the junction of the breast-bone and the collar-bone, just above that junction in soft tissue. Mrs. Wehrmann

was facing her murderer when he fired each shot, and he was very close to her, as is shown by the fact that her body was badly powder-burned. In addition to the bullet wounds on the person of Mrs. Wehrmann, her skull had been broken with a broad, blunt instrument, and the evidence tends to prove that this wound was inflicted with a hatchet that was found in the cabin. It was covered with blood.

The child was shot three times. The child seems to have had his back to the murderer when the shots were fired. Two of the bullets entered the back of its head. The wounds on the child were badly powder-burned. The bullet wounds on the mother and the child were made with bullets of the same size.

Dr. A. N. Creadick examined these bodies on September 7th and expressed the opinion that they had been dead about three days.

When Sheriff Thompson entered the cabin, he found the body of Mrs. Wehrmann on the bed, with her legs hanging over the side of the bed; one foot touching the floor, and the other being four or five inches from the floor. Her body was lying diagonally across the bed, possibly a foot and a half or two feet from the head of the bed, her right arm being extended at full length, and the dead child lying partially across her right arm, and its head being on the upper side of the arm. The child was lying on the left side of its face, and the right side of its face being toward its mother. The child was fully dressed. Mrs. Wehrmann had on shoes and stockings and rubbers over the shoes. Her clothes were up around her stomach.

There was blood on the wall and the back of the bed. Near the head of the bed was a pool of blood. Part of the wall was saturated with blood, and the child's head was lying in a pool of blood. Mrs. Wehrmann's

head was also lying in blood, and there was blood on the pillows. There was, near the bed, a basin of discolored water. It appeared to be bloody water, but there was not a great amount of blood in it.

Most, if not all, of the six bullets that had been fired into Mrs. Wehrmann and the little boy were found and identified and put in evidence. That this was "a murder most foul" there can be no doubt.

The question for decision is: Was there sufficient evidence adduced to authorize the court to submit the case to the jury? The murder was conclusively proved, and the only real question for determination was whether the defendant was the murderer.

The defendant's wife went into the Polk County hop-fields on August 30th, about five days before the murder was committed, and he was living in his tent alone, about three quarters of a mile from the cabin in which Mrs. Wehrmann and the little child were living alone. Mr. Wehrmann was a baker and had regular employment in Portland. He worked there, but went home Saturday nights and stayed with his wife and child until Sunday evenings. Pender knew this. He was acquainted with Mrs. Wehrmann and the little child.

A few days before the murder, when Mr. Wehrmann was at home, Pender was there outside the house, talking to Wehrmann and the child, and Mrs. Wehrmann passed out a chair through the window for one of them to sit on, but she remained in the cabin.

On Monday before Labor Day, about a week before the murder, the defendant was at the residence of Mrs. Anna Nelson, one of the neighbors, and Mrs. Wehrmann called there, and, when the defendant saw her coming, he jumped up and said he "must go." He left the house just as Mrs. Wehrmann entered it, passing very close to her. They saw each other, but

neither spoke. A short time before that, the defendant and Mrs. Wehrmann had walked together part of the way toward Scappoose. Why the defendant and Mrs. Wehrmann did not speak to each other when they met at Mrs. Nelson's does not appear from the evidence.

The people of that community had a mail-box on a large stump about 150 feet from the defendant's tent. When the defendant or some of the other neighbors went to Scappoose, they usually got their neighbors' mail and carried it to this box and deposited it there for the persons to whom the mail was addressed. The neighbors went there and obtained their mail. The box had a lid, but it was not locked. Sometimes packages other than mail were deposited in this box.

On Saturday before the murder, Mrs. Rachel E. Bates, a neighbor of the defendant, who had made some lace curtains for Mrs. Wehrmann, was at the community mail-box, near the defendant's tent, and she wrapped these curtains in paper and wrote Mrs. Wehrmann's name on the package, and caused it to be deposited in the mail-box for Mrs. Wehrmann. The defendant was present when this was done, and there is evidence tending to prove that the defendant admitted, after the murder, that he knew that said package was placed in said box by Mrs. Bates on Saturday. The evidence tends also to prove that the defendant admitted, after the murder, that he examined the mail-box on Sunday evening, September 3d, and that there was at that time nothing in it. This is an important fact to remember.

There is evidence showing that Mr. Wehrmann's mother resides in Iowa and takes a paper published in Iowa, and, after she reads it, she habitually sends it to Mr. Wehrmann.

The defendant was at Scappoose on Labor Day, September 4, 1911, and got the community mail, and took it to the box and deposited it there as usual. There is evidence tending to prove that, on said day, a paper was delivered by a postoffice clerk at Scappoose to the defendant, for Mr. Wehrmann. The defendant admits getting the community mail that day and depositing it in said box, but he denies that he on that day received any mail for the Wehrmanns. He admits, however, that he was in the habit of getting mail for them, and there is evidence tending to prove that he did on that day get a paper for them.

Frank Wehrmann, the husband of Mrs. Wehrmann, testifies that he was at home during the week ending Sunday evening, September 3, 1911, being sick and unable to work. He testifies that no package or paper was taken to his cabin at any time during that week, and that he returned to Portland to work on Sunday evening, September 3d.

The evidence tends to prove that the murder was committed on Monday evening or night, September 4th, that being Labor Day, and, as the Iowa paper and the Bates' package were both found on a chair unopened when the sheriff entered the cabin, it seems probable that said paper and package had not been in the cabin long enough before Mrs. Wehrmann's death to enable her to open either of them. As she knew that Mrs. Bates was making the lace curtains for her, it is not likely that the package would have remained in her house long unopened.

The evidence of the postoffice clerk tends to connect the defendant with the Iowa paper and to show that he received it on September 4th, probably only a few hours before Mrs. Wehrmann was killed.

The evidence shows that the Bates' package was deposited in the mail-box on Saturday afternoon, September 2d, in the presence of the defendant, and he admitted to the officers that he knew it was put in the box on Saturday, and he stated to the officers also that he looked into the box on Sunday evening, September 3d, and that there was nothing in the box at that time. Evidently, then, someone took the Bates' package out of the mail-box between the time it was deposited there on Saturday afternoon and Sunday evening, when the defendant looked into the box and saw that it was empty. Mr. Wehrmann testifies that no package or paper was taken to his cabin on Saturday or at any time on Sunday before he left for Portland on Sunday evening.

When the defendant looked into the box on Sunday evening, he may have taken the Bates' package out and have kept it until he obtained the Iowa paper the next day, and he may have taken the package and the paper to the Wehrmann cabin on Monday night as an excuse for making a call upon Mrs. Wehrmann, and the murder may have been committed immediately thereafter.

It is evident from the statement of the defendant that the mail-box was empty on Sunday evening; that someone had taken the package out either before or at that time; and the evidence of Mr. Wehrmann shows that it had not been taken to his cabin at any time before Sunday evening, when he left for Portland. Mrs. Wehrmann could not have obtained the package from the mail-box after her husband left on Sunday evening, because, according to the statement of the defendant, it was not in the box after that time. It seems quite certain that someone took this package from the box on or before Sunday evening, and that it

was not taken to the Wehrmann cabin until a very short time before Mrs. Wehrmann was killed.

After the murder was discovered, quite a number of the witnesses noticed that the left side of the defendant's face had been pretty badly scratched. There were three scratches on the left side of his face, and these scratches extended in parallel lines from his cheek-bone downward, about three inches. He had not shaved for about a week, but these scratches, according to the evidence, were plainly visible, and caused suspicion to rest upon him. The defendant denied that he had any scratches on his face, and attempted to show that what was thought to be scratches was some sort of breaking out to which he was subject; but breakings out would hardly run in parallel lines three inches long. These scratches were noticed three or four days after Mrs. Wehrmann was killed. The evidence shows that Mrs. Wehrmann had long finger nails. According to the evidence these scratches were such as could have been made by a person who had long finger nails. The facts indicate that, when Mrs. Wehrmann was shot, she was very close to her murderer facing him. With her right hand she could have made the scratches referred to on the left side of his face.

From the evidence there can hardly be a doubt as to what the motive of her murderer was. She died rather than submit to dishonor, and it is probable that her child was killed because her murderer feared that he might be able to make known who the murderer was. The evidence shows that the child was acquainted with the defendant.

Most of the bullets fired by the murderer, in killing Mrs. Wehrmann and her child, were obtained by the officers, identified, and put in evidence. The pistol,

with which the prosecution contends the crime was committed was also admitted in evidence.

Witnesses, skilled in the use of firearms, testified concerning this pistol and said bullets. The evidence shows that said pistol is a 38-caliber Colt's, and that the bullets found, as stated *supra,* fit this pistol. There was evidence tending to prove that the pistol referred to contained a gas-pit, and that rust had made deep places in the barrel of the pistol, and that these places in the barrel of the pistol are of such size and shape that, when bullets are shot through its barrel, distinct marks were made on the bullets. Witnesses made experiments with this pistol and testified that bullets shot from it contained these marks. The evidence tends also to show that the bullets taken from the body of Mrs. Wehrmann and those found in the bed and on the floor of the cabin contained these peculiar marks. This evidence tends to prove that Mrs. Wehrmann was killed with this pistol. The evidence shows that this pistol belongs to John H. Riley. Riley and Hassen had a cabin situated only a few yards from the tents in which the defendant resided. They were usually at their cabin on Saturday nights and Sundays. They had employment elsewhere. In their cabin they had a large trunk containing clothing and other things. This pistol was kept in the trunk, and the trunk was locked and the cabin also was locked when they were not at home. A day or two before the murder Riley and Hassen went away and locked the cabin. This pistol was in the trunk in the cabin, and it was not loaded when they left the cabin, and the trunk was locked. Some weeks before the murder, the defendant had this pistol borrowed to shoot wild animals that bothered his chickens. He had it two or three weeks, and returned it to Mr. Riley. A short time before the

murder, the defendant borrowed the key of the cabin and had it for a short time, and a person, visiting at his tents, slept in said cabin. He returned the key to the owners of the cabin a short time before the murder. He was familiar with the cabin and its contents, and knew that said pistol was kept there. Ammunition for the pistol was kept in said cabin.

The evidence shows that, after the discovery of the murder, it was ascertained that someone had broken open said cabin and had broken into the trunk. After the murder, Sheriff Thompson entered the cabin and found that the trunk had been broken into, but he found this pistol in the trunk, and it was loaded.

The evidence tends to show that, when Riley and Hassen locked this trunk and the cabin and went away, the pistol was in the trunk and unloaded. Nothing that had been in the trunk was missing, but the pistol was loaded when the sheriff found it. This fact tends to prove that someone had been using this pistol and had returned it loaded. The brass nails that had held the lock of the trunk in place had been drawn, and the lock had been pulled out. The lock had fresh marks and scratches upon it that had been made with some instrument. The sheriff found, lying on the table in the cabin, a claw-hammer whose claws had been broken to some extent. The sheriff discovered in the broken claws of the hammer, with the aid of a magnifying-glass, small particles of brass. The officers applied the broken claws of the hammer to the marks and scratches that had been made on the lock of the trunk when it was broken open, and found that they fitted said marks and scratches. The brass particles in the broken claws of the hammer probably adhered to the claws of the hammer when the brass nails were drawn with it. This evidence tends to prove that the trunk was broken

open with this claw-hammer. The evidence shows that this hammer did not belong in the cabin, and it tended to prove that it belonged to the defendant, and that he had been using it at a house that he had been working upon near by.

The evidence tends to show that the defendant, after the murder and before he was accused, appeared to be nervous and uneasy. The evidence tends to show that this murder was committed on the evening of September 4th; that the appellant did not wind his clock that night; that he did not put up his chickens until late that night; that he did not milk a cow of which he had charge, or feed its calf that night; that there was no light in or about his tent until late that night, and then that it burned all night; that he thereafter showed great reluctance to remain alone; that he requested J. B. Frazier to stay with him on the night of September 5th, and during that night put the lights out; that on Frazier's leaving next day, in opposition to appellant's efforts to prolong his stay, the defendant went up to Hanson's avowedly for the purpose of getting a man to help him on the Schnitzer house, and did get a man who remained with him several days.

2. A motion for an instructed verdict is equivalent to a demurrer to the evidence, and a review thereof is governed by the rules applicable to a motion for a nonsuit: *National Bank* v. *Fire Assn., 33 Or. 192, 193 (50 Pac. 568, 53 Pac. 8).

A cause not sufficient to be submitted to a jury is one where it appears that if the jury were to find a verdict for the plaintiff, upon any or all of the issues to be tried, the court ought, if required, to set it aside for want of evidence to support it: Section 183, L. O. L.

We have examined the evidence, and we find that there was sufficient evidence to authorize the trial court

to submit the case to the jury. The evidence was conflicting on some points, but it is the province of the jury to determine the weight of the evidence and the credibility of the witnesses. We think that the evidence for the prosecution was clearly sufficient to support the verdict found, and we do not feel authorized to say that, because some of it was disputed by evidence for the defense, the evidence was insufficient to be submitted to the jury. The evidence as a whole was sufficient to be submitted to the jury.

3. We find that the court below did not err in admitting in evidence the Colt's revolver, the claw-hammer, the trunk, the Bates package, the Iowa paper, or the bullets found in the Wehrmann cabin or in the body of Mrs. Wehrmann. All these matters are referred to *supra*. The bullets were shown to be of the proper size and make for use in said pistol, and there was evidence tending to prove that they were shot from said pistol at the time that Mrs. Wehrmann was killed, and that she was killed with some of them, and there was evidence tending to prove that the defendant did the shooting.

4. The defendant contends also that the trial court erred in not permitting him to show that there were a large number of men working at logging camps within three miles of the Wehrmann cabin, and that a velocipede was stolen about the time of the murder.

We think that the court's rulings were correct. The fact that a large number of men were working at logging camps about three miles distant, and that a velocipede was stolen, would not have tended to show who killed Mrs. Wehrmann or to prove that the defendant did not kill her. We think that said two facts had no relevancy to the case. The proof of said facts would not have authorized the jury to infer that some

of the men engaged in logging may have killed the deceased, or that the person who stole the velocipede may have been the murderer. Those facts were too remote to have any legal relevancy to the matter at issue.

5. The defendant contends also that the trial court erred in overruling his motion for a new trial and in entering judgment against him.

Section 1626, L. O. L., relating to appeals in criminal actions, is as follows:

"After hearing the appeal the court must give judgment, without regard to the decision of questions which were in the discretion of the court below, or to technical errors, defects or exceptions which do not affect the substantial rights of the parties."

In criminal cases this court is inhibited, by the section cited *supra,* from reviewing any decision of the trial court that rested in the discretion of that court. The inhibition is express, and we must obey the mandate of the law.

When the trial court denies motions for judgments of nonsuit or for directed verdicts, this court has power to examine the evidence, and, if it is found that there was not sufficient evidence to be properly submitted to the jury, it may reverse the judgment of the trial court, because the decisions of the trial court on motions for a judgment of nonsuit or for an instructed verdict do not rest in the discretion of the court below. But the power to grant or refuse a motion for a new trial is to be exercised in the discretion of the trial court, and hence this court cannot review the action of the trial court in refusing to allow a motion for a new trial: See *Bowen* v. *State,* 1 Or. 271; *State* v. *Fitzhugh,* 2 Or. 227; *State* v. *Wilson,* 6 Or. 428; *State* v. *McDonald,* 8 Or. 113; *State* v. *Becker,* 12 Or. 318 (7 Pac. 329);

*State* v. *Mackey,* 12 Or. 154 (6 Pac. 648); *State* v. *Roberts,* 15 Or. 187 (13 Pac. 896); *State* v. *Clements,* 15 Or. 237 (14 Pac. 410); and *State* v. *Gardner,* 33 Or. 152 (54 Pac. 809).

In *State* v. *Roberts,* 15 Or. 187 (13 Pac. 896), the court says:

"The other exceptions are not available on this appeal, for the reason that the ruling of the trial court on a motion for a new trial cannot be assigned for error in this state. Our Code has made no provision for reviewing the ruling of the trial court on such motion, and therefore this court cannot examine the same."

In *State* v. *Becker,* 12 Or. 318 (7 Pac. 329), the court says:

"The appellant was convicted of the crime of arson. A motion was made for a new trial, on the ground that one of the jurors had drank intoxicating liquors during the trial, and also on the ground of the insufficiency of the evidence to justify the verdict. The motion was denied; hence this appeal. The questions raised are not the subject of an appeal, as has just been shown in the case of *Kearney* v. *Snodgrass,* 12 Or. 311 (7 Pac. 309), and the authorities there cited."

In *State* v. *McDonald,* 8 Or. 113, the court says:

"This motion (for a new trial) being based on matters *dehors* the record was addressed to the sound discretion of the court below, and cannot be assigned and reviewed on appeal. The Code provides that 'after hearing the appeal the court must give judgment without regard to the decision of questions which were in the discretion of the court below.' * * This court has heretofore ruled to this effect in several cases."

6. The Civil Code, Section 548, was so amended in 1907 as to allow an appeal from an order setting aside a judgment and granting a new trial; but an order

denying a motion for a new trial is not an appealable order. The amendment referred to does not apply to criminal actions. The order denying a motion for a new trial is not an appealable order; and hence we cannot consider it.

7. The defendant contends, also, that the trial court erred in permitting the state to impeach the witness Fonda Pender, by introducing public records, showing that she was not married to the defendant at the time she testified she was. We have read carefully Mrs. Fonda Pender's evidence, and we find that her evidence was not at all important. She was in Polk County at the time that the murder was committed and for some time thereafter. The evidence admitted tended to show that she was not married to the defendant at the date that she said she was. The date of their marriage was not material. If the admission of said record in evidence was error, it was harmless. The evidence that she gave was nearly all immaterial, and the facts that she stated that had any bearing on the case were testified to by other witnesses or were not disputed. Proving that she and the defendant were not married at the date stated by her did not affect the substantial rights of the defendant. Section 1626, L. O. L., requires this court to disregard technical errors, defects and exceptions which do not affect the substantial rights of parties. It is not necessary to decide whether the admission of said evidence was error, as we hold that it did not affect the substantial rights of the defendant.

8. The defendant asserts also that the case should be reversed because the district attorney, who tried the case in the court below, in his argument to the jury, went out of the record and made objectionable references to one of the witnesses for the defendant. The

defendant failed to mention this in his assignments of error. The remarks are as follows:

"There is Craddock, the man who owes his job and his position to Logan, but what does this man Craddock say?"

Counsel for the defendant objected to said remark and asked the court to instruct the jury to disregard it. The district attorney then said:

" * * But it seems that after this man Craddock had been here upon the stand Saturday, and had so glibly testified to facts as he called them here, he went back to Portland in company with Logan and in company with another of Logan's clients that he just kept out of the penitentiary. They went to do a little experimenting."

This also was objected to. Some of the remarks of the district attorney were improper.

In the argument of cases district attorneys have no privileges that other counsel have not. It is their duty to keep within the facts testified to, and not to permit their zeal to carry them beyond their limits as counsel, and it is the duty of trial courts to keep all counsel within proper limits. Trial courts are armed with ample power to do so. When counsel step beyond the facts of the case, in their arguments, trial courts should stop them and compel them to desist, and, if they state any facts not in evidence, the court should instruct the jury to disregard them.

In this case the district attorney did not attempt to state any material facts concerning the matters in issue. He said that the witness Craddock owed his job and position to Logan, one of the attorneys for the defendant; but, if the bill of exceptions states all that he said on that point, neither the jury nor the court knew what was meant by the statement. We think that

the remarks made by counsel and objected to were improper, but that they were not prejudicial to the defendant, and that we have no right to reverse the judgment on account thereof.

If the district attorney had stated to the jury material facts not in evidence, tending to show the guilt of the defendant, a different question would be presented. What the district attorney said was in criticism of a witness, but it was not sufficient to be prejudicial to the defendant. Counsel should make their criticisms within the testimony, and it is the duty of trial courts to see that they do so.

We find no reversible error, and the judgment of the court below is affirmed.

AFFIRMED. REHEARING DENIED.

MR. CHIEF JUSTICE McBRIDE, MR. JUSTICE EAKIN and MR. JUSTICE MOORE concur.