Argued July 7, affirmed September 26, rehearing denied November 28, 1922.

## STATE *v.* WALTERS.

(209 Pac. 349.)

**Criminal Law — Evidence of Robberies Committed by Defendant Held Admissible to Show Motive for Killing Policeman.**

1. Where defendant and another committed several robberies, and, when accosted by a policeman searching for the guilty parties, defendant shot the policeman, and there was evidence that he had said he would not be taken, evidence of the robberies was admissible on a trial for murder, as tending to show motive.

**Criminal Law—Evidence of Other Crimes Inadmissible as a General Rule.**

2. As a general rule, evidence of crimes other than that charged in the indictment is inadmissible.

**Criminal Law—Evidence of Motive Competent, and Ordinarily is Given Wide Latitude.**

3. Though the prosecution is not bound to prove motive, evidence of motive is competent and ordinarily a wide latitude is allowed in proving motive.

**Criminal Law—Refusal of Instruction as to Accomplice Testimony Harmless, if Witness not an Accomplice.**

4. The refusal to charge in the language of Section 868, subdivision 4, Or. L., that the testimony of an accomplice ought to be

viewed with distrust, did not injure defendant, if the witness at whose testimony it was directed was not an accomplice.

**Criminal Law—Test of Accomplice is Liability to Punishment for Same Crime.**

5. As a general rule, the test as to whether a witness is an accomplice is whether he himself could be indicted and punished for the crime for which accused is being tried.

**Criminal Law—One Participating in Robberies, but not in Subsequent Homicide, not an Accomplice.**

6. One participating with defendant in the commission of several robberies, but not participating in or connected with the killing by defendant of a policeman, who accosted them while searching for the robbers, was not an accomplice.

**Criminal Law—Instruction to be Read in Connection With Rest of Charge.**

7. An instruction of which complaint is made must be read in connection with the remainder of the charge.

**Criminal Law—Instruction as to Presumption of Intent to Murder from Use of Deadly Weapon not Erroneous, in Connection With Other Instructions.**

8. An instruction that an intent to murder was conclusively presumed from the deliberate use of a deadly weapon causing death was not erroneous, when read with the remainder of instructions charging that this presumption would not warrant a conviction for a crime above the grade of murder in the second degree, and that to find defendant guilty of murder in the first degree, there must be additional proof beyond a reasonable doubt of deliberation and premeditation, and it must be shown that the design to kill was formed and matured in cool blood, and not hastily on the occasion.

From Multnomah: Robert Tucker, Judge.

In Banc.

AFFIRMED.    REHEARING DENIED.

Husted A. Walters, on November 17, 1920, shot and killed Jerome Palmer, a policeman, at the southeast corner of the intersection of Sixth and Glisan Streets in the City of Portland. The defendant was tried upon an indictment charging him with murder in the first degree. The jury returned a verdict of guilty as charged in the indictment and did not recommend life imprisonment: See Laws 1921, p. 6. The defendant appealed from the consequent judgment.

For appellant there was a brief and oral argument
by *Mr. B. F. Mulkey.*

For respondent there was a brief over the names of
*Mr. Stanley Myers,* District Attorney, and *Mr. Wm.
H. Hallam,* Deputy District Attorney, with an oral
argument by *Mr. J. L. Hammersley,* Deputy District
Attorney.

HARRIS, J.—The defendant and John Tillman
were soldiers stationed at Camp Lewis. They left
camp without leave, arriving in Portland at about
3:10 P. M. on November 17, 1920. Each was in full
uniform; each wore a campaign hat; and each had
with him an army automatic pistol. After arriving
in Portland they sold one of the pistols. Afterward
at about 7 P. M. near Nineteenth and Everett Streets
they held up and robbed Thomas E. Fanning. They
committed a second robbery when they held up Ole
and John Indergard at about 7:30 P. M. on First
Street between Stark and Washington Streets. At
about 9:45 P. M. they held up and robbed a man near
the intersection of Ninth and Flanders Streets. The
Indergard holdup was reported to the police station
at 7:40 P. M.; the Fanning holdup at about 8 P. M.;
and the third robbery at about 9:45 P. M. A descrip-
tion of the men who had committed the robberies was
given to those in charge of the police station. The
detective department and "all the officers on the
beats," were notified and given the description of the
soldiers who had committed the robberies.

A posse of station men, including Jerome Palmer,
was organized at about 10 P. M. and they got in the
patrol wagon and went to Ninth and Flanders and
there E. Thorpe, a policeman, joined them; and they
then proceeded to Sixteenth and Pettygrove Streets

to investigate a place where soldiers sometimes congregated. Finding this place "locked up," Palmer suggested that he and Thorpe board a street-car "and go around on the street-car." Thorpe and Palmer entered a street-car, and the patrol-wagon "went back." When the wagon reached a point about a block from the intersection of Sixth and Glisan Streets three shots were heard by officers in the wagon. Broadway, Sixth and Fifth Streets run north and south parallel with each other and are intersected by Glisan Street which extends east and west. Officers Thorpe and Palmer rode on the front of the street-car keeping a lookout for soldiers. The officers left the street-car at the intersection of Broadway and Glisan. After the officers left the car Palmer looked down Glisan Street and saw two soldiers standing at the corner of Glisan and Sixth Streets. Broadway is one block west of Sixth Street. The two officers at once proceeded east on Glisan Street, and after they had gone about one third of the block the two soldiers started south on Sixth Street, and the two officers then ran to Sixth and Glisan. In the meantime the two soldiers, who proved to be the defendant and John Tillman, had turned around and were walking back north on Sixth Street toward Glisan. Upon seeing the soldiers walking back towards Glisan Street, the officers timed themselves so as to intercept the soldiers at the southeast corner of the intersection of Glisan and Sixth Streets. When the officers met the soldiers at the corner, Thorpe said: "Boys, just a minute, I want to see you." Tillman "stopped right there," but Walters "walked right on, stepped off the curb." Palmer gave his attention to Walters, and Thorpe gave his attention to Tillman. Thorpe ordered Tillman to take his hands out of his pockets and Tillman

"had just started to pull his hands out of his pockets when Walters shot Palmer." Thorpe immediately took his "gun off of" Tillman and shot at Walters, and it is probable that this was the shot which wounded Walters in the shoulder.

Walters proceeded about fourteen feet after he and Tillman were accosted by Thorpe, and Walters was only five or six feet from Palmer when he shot Palmer. Walters ran east on Glisan Street and Thorpe "stepped out in the street and took two more shots at him and he turned around and answered with another shot," which struck Thorpe but did not seriously hurt him. The defendant ran to Fifth Street and turned north on Fifth, followed by Thorpe and officers who had left the patrol wagon, and by officers on patrol duty in that section. A number of shots were fired at Walters while in flight, and there is evidence that he fired at least two shots at his pursuers. The defendant sought refuge in the railroad yards near by and was soon captured there. Officers Thorpe and Palmer were in uniform and each was wearing a policeman's helmet when the defendant shot Palmer. Sixth Street is well lighted, and the defendant knew that Thorpe and Palmer were policemen.

1, 2. Ole Indergard was permitted, over the objection of the defendant, to tell the jury that he and his brother John had been held up and robbed by the defendant and Tillman. The state called John Tillman as a witness and he was permitted to testify, over the objection of the defendant, about the three robberies committed by the witness and the defendant prior to the homicide. The defendant insists that there was no connection between the robberies and the homicide, and that therefore it was prejudicial error under the doctrine of *State* v. *Start*, 65 Or. 178.

184 (132 Pac. 512, 46 L. R. A. (N. S.) 266), to receive
this testimony of Ole Indergard and John Tillman.
Broadly stated, the general rule accepted everywhere
is that evidence of crimes other than that charged
in the indictment is inadmissible; but this general
rule is subject to a few exceptions which are as firmly
established as the general rule itself: *State* v. *O'Don-
nell,* 36 Or. 222 (61 Pac. 892). The facts appearing
in the record bring the instant case clearly within
one of the established exceptions.

The state proved by direct testimony that the de-
fendant shot and killed Palmer. Indeed the defend-
ant, as a witness for himself, admitted that he fired
the shot. Palmer was a policeman. Sixth Street was
well lighted; the killing occurred near a lamp-post
containing a cluster of lights; Palmer wore the uni-
form of a policeman, including a helmet; one witness,
John M. Reek, when a block away saw Palmer fall
and "could tell it was an officer"; another witness,
C. Barber, was at the intersection crossing of Fourth
and Glisan Streets, two blocks away from the scene
of the homicide, and upon hearing the shot "looked
up there" and "saw an officer fall after the first
shot" and "could see it was an officer by his cape
and helmet." Tillman testified that after the third
holdup he told the defendant "that the police was
going to get us" and that the defendant "said he did
not care, they were not going to take him." Tillman
also testified that when he first saw Palmer and
Thorpe "they were across the street" and were pro-
ceeding to the corner of Sixth and Glisan and that he
and the defendant were at that moment going toward
the same corner and were about thirty feet from it,
and that upon seeing the officers he said to the de-
fendant "there comes the police now." On direct
examination the defendant testified:

"They [Thorpe and Palmer] both came up side by side, and I do not remember just what they said, but I told my partner before they had come up I would not—after doing this I would not stand for arrest, but I would take a run for it first."

The defendant as a witness for himself also testified on direct examination that he did not know what was his object in shooting and that

"I did not realize why I did shoot; I was drinking —under the influence of liquor; I was not drunk, but I was under the influence of liquor. I don't really know why I did shoot."

3. Evidence showing the motive for the commission of a crime is competent; and, although as stated by Mr. Justice BURNETT in *State* v. *Humphrey,* 63 Or. 540, 550 (128 Pac. 824), "the prosecution is not bound to prove a motive for the criminal act charged in the indictment," it is permitted to do so. Ordinarily a wide latitude is allowed for proving the motive: *State* v. *Ingram,* 23 Or. 434 (31 Pac. 1049); 16 C. J. 547, 590; 13 R. C. L. 910. The defendant was being tried upon a charge of murder in the first degree, and it was peculiarly appropriate to ascertain why he fired the fatal shot and to learn his intent, for the indictment embraced three punishable degrees of homicide: *State* v. *Reed,* 53 Kan. 767 (37 Pac. 174, 42 Am. St. Rep. 322). See also *State* v. *Martin,* 47 Or. 282, 285 (83 Pac. 849, 8 Ann. Cas. 769). Obviously, he fired the shot in order to prevent arrest by officers of the law. The crime for which the defendant was being tried arose out of the robberies. The killing would not have occurred if the robberies had not been committed. The robberies furnished the motive for the killing. Under all the authorities evidence showing the commission of the robberies was competent: *State* v. *Hembree,* 54 Or. 463, 474 (103

Pac. 1008); *State* v. *Finch,* 54 Or. 482, 488 (103 Pac. 505); *State* v. *Wilkins,* 72 Or. 77, 86 (142 Pac. 589); *Bishop* v. *Commonwealth,* 22 Ky. Law Rep. 760 (58 S. W. 817); *People* v. *Woods,* 147 Cal. 265 (81 Pac. 652); *People* v. *Wilson,* 117 Cal. 688 (49 Pac. 1054); *People* v. *Pool,* 27 Cal. 572; *Moore* v. *United States,* 150 U. S. 57 (39 L. Ed. 996, 14 Sup. Ct. Rep. 26, see, also, Rose's U. S. Notes); *Dunn* v. *State,* 2 Ark. 229 (35 Am. Dec. 54). See, also, precedents cited in *State* v. *O'Donnell,* 36 Or. 222, 226 (61 Pac. 892), in support of the third exception to the general rule, and also cases collected in *State* v. *McClard,* 81 Or. 510, 512 (160 Pac. 130).

4. Tillman testified as a witness for the prosecution, and the defendant complains because the trial judge did not instruct the jury, in the language of Section 868, subdivision 4, Or. L.:

"That the testimony of an accomplice ought to be viewed with distrust."

Although the defendant neither requested such instruction nor excepted because it was not given, we shall assume, without deciding, that it was error to omit to give it if Tillman was an accomplice. If Tillman was not an accomplice then of course the defendant was not injured. Although there is no universally accepted definition of the term "accomplice," it is said in this jurisdiction that the "term includes all the *particeps criminis* whether considered in strict legal propriety as principals or accessories": *State* v. *Roberts,* 15 Or. 187, 197 (13 Pac. 896); *State* v *Odell,* 8 Or. 31, 33; *State* v. *Edlund,* 81 Or. 614, 617 (160 Pac. 534).

5. As a general rule the test as to whether a witness is an accomplice is whether he himself could be indicted and punished for the crime for which the accused is being tried. If he could be so tried and

punished, then he is an accomplice; if he could not, then he is not an accomplice: *State* v. *Turnbow,* 99 Or. 270, 280 (193 Pac. 485, 195 Pac. 569); *Stone* v. *State,* 118 Ga. 705 (45 S. E. 630, 98 Am. St. Rep. 145); 1 R. C. L. 157.

6. Tillman was an accomplice in the commission of the three robberies; but the record does not disclose a word of evidence having the slightest tendency to show that he participated in or was connected with the homicide. Tillman was not an accomplice in the killing of Palmer, and, therefore, the trial judge properly omitted to instruct the jury about viewing the testimony of an accomplice with distrust.

The following is the remaining assignment of error:

"The court erred in instructing the jury as follows: 'An intent to murder is conclusively presumed from the deliberate use of a deadly weapon causing death within a year.'"

The defendant did not in any form object or except to the giving of this instruction, and consequently in this condition of the record it would be sufficient to hold that the question sought to be raised is not properly here for decision. However, the giving of the instruction did not injure the defendant.

7. The instruction must be read in connection with the remainder of the charge: *State* v. *Megorden,* 49 Or. 259, 269 (88 Pac. 306, 14 Ann. Cas. 130). After giving the instruction to which objection is made, the court defined a deadly weapon and then gave the following instruction:

"The deliberate use of a deadly weapon necessary to constitute a conclusive presumption of intent to murder is the use of such weapon without cause or provocation, real or imaginary; but this intent to

murder arising from the deliberate use of a deadly weapon, although conclusive and binding upon the jury, will not raise the crime above the grade of murder in the second degree. This means that if the state proves to you beyond a reasonable doubt that the defendant by the deliberate use of a deadly weapon, and without cause or excuse killed Jerome Palmer in this county and state on or about the 17th day of November, A. D. 1920, and nothing else is shown, an intent to murder in the second degree would be conclusively proved, and your verdict should be, under such circumstances, guilty of murder in the second degree, but in order to find the defendant guilty of murder in the first degree there must be additional proof beyond a reasonable doubt that there was deliberation and premeditation upon the part of the defendant, and it must be shown by the evidence that the design to kill the deceased was formed and matured in cool blood and not hastily upon the occasion.''

The charge to the jury included the definitions of the three degrees of unlawful homicide and a thorough explanation of their respective constituent elements. The jury were likewise informed that the burden of proof was upon the prosecution and that before the defendant could be adjudged

''guilty of the crime charged or of any of the lesser degrees included therein it is necessary for the state to prove the defendant guilty beyond a reasonable doubt.''

8. The challenged instruction, when read in connection with the remainder of the charge, was in entire accord with the holding in *State* v. *Gibson,* 43 Or. 184 (73 Pac. 333), and with other precedents dealing with the same subject: *State* v. *Carver,* 22 Or. 602 (30 Pac. 315); *State* v. *Bartmess,* 33 Or. 110, 130 (54 Pac. 167); *State* v. *Gray,* 46 Or. 24, 31 (79 Pac. 53).

The defendant was ably defended. He had a fair trial. The record of his trial is free from prejudicial error; and, therefore, we are compelled to affirm the judgment.      AFFIRMED.   REHEARING DENIED.

BROWN, J., not sitting.