Argued June 28, reversed and remanded October 9, 1923.

## STATE v. WESTON.

(219 Pac. 180.)

**Criminal Law—"Accomplice" as Relates to Persons Whose Testimony must be Corroborated Defined.**

1. The term "accomplice" as applied to a witness and relating to the necessity for corroboration of his testimony includes all persons who were concerned in the commission of the offense, and the grade of guilt of the witness is not important.

**Criminal Law—Test as to Whether Witness is Accomplice Whose Testimony must be Corroborated Stated.**

2. The test as to whether a witness is an accomplice of defendant whose testimony must be corroborated is: Could he be lawfully indicted for the offense for which defendant was indicted and is being tried?

**Criminal Law—Exoneration by Grand Jury not Competent Evidence of Accomplicity of Witness.**

3. The mere fact that a witness' case has been passed upon by the grand jury, and that he has been exonerated, is not competent evidence of the accomplicity of the witness.

**Criminal Law—When Question as to Whether Witness is an Accomplice is One of Law or Fact Stated.**

4. Where all facts in relation thereto are admitted and no dispute is raised by the evidence, the accomplicity of the witness is a ques-

tion of law for the court to determine, but if the facts are disputed it becomes a question to be submitted to the jury.

### Criminal Law — Instruction as to Coercion of Alleged Accomplice Held Unwarranted.

5.  In a prosecution for homicide, an instruction that if the jury believed that a particular witness participated in the commission of the crime, "but that his participation was involuntary and actuated through fear, threats, or coercion, sufficient to cause him to believe that he was in immediate danger of life and limb, then I instruct you he was not an accomplice, and his testimony if believed, is sufficient proof to any fact testified to without corroboration," *held* unwarranted by the evidence.

### Criminal Law—Threatened Danger to Excuse Participation in Crime must be Present and Impending.

6.  To excuse crime on ground of coercion, threats or menace must not be of future violence, but of present, impending and imminent violence at the time of the commission.

### Homicide—Compulsion or Coercion, not Defense.

7.  Under Sections 1908–1910, Or. L., defining justifiable and excusable homicide, fear, duress or compulsion due to the act of another does not render the killing excusable, or constitute a defense.

### Criminal Law—Mere Presence of Terrified Onlooker and Failure to Report will not Render Him an "Accomplice" Whose Testimony must be Corroborated.

8.  The mere presence of a terrified onlooker, or his failure to report a crime, does not constitute him an accomplice whose testimony must be corroborated.

### Criminal Law—No Distinction in Law Between an Accomplice as a Witness and as a Defendant.

9.  The law makes no distinction between an accomplice as a witness and such party as a defendant.

### Criminal Law—Witness, if a Participant in a Homicide, is an "Accomplice," though Actuated by Fear or Compulsion.

10.  A witness who has participated in a homicide, though actuated by threats, coercion or fear of immediate danger to life and limb, is nevertheless an accomplice within Section 2370, Or. L., declaring that persons directly committing or aiding and abetting in the commission of a crime are principals whose testimony is not sufficient proof of any fact testified to without corroboration, within Section 1540, Or. L.

### Criminal Law — Written Statement Made by Witness Before Trial Held Inadmissible.

11.  In a prosecution for homicide, a statement made by a witness before trial, when under arrest, which contained much matter prejudicial to accused, *held*, under Section 711, Or. L., and Constitution,

---

7.  Duress as defense to prosecution for murder, see note in 3 Ann. Cas. 1028.

Article I, Section 11, improperly read, notwithstanding it was on redirect examination, after part of it was read by defendant on cross-examination of the witness.

**Criminal Law—Instruction as to Effect of Intentional Falsehood of Witness Sustained—"False Witness."**

12. An instruction that "witness who is intentionally false in a material part of his testimony is to be distrusted in others," *held* not erroneous; a mistaken witness being not a "false witness" within Section 868, subdivision 3, Or. L.

**Criminal Law—Map of Deceased's Premises Held Admissible in Evidence.**

13. In a prosecution for murder a map of deceased's premises *held* properly received in evidence.

**Criminal Law—Instruction to Effect That Oath Imposes No Duty on Juror to Doubt That Which He Would Otherwise Believe Held not Error.**

14. An instruction to the effect that the taking of an oath by a juror imposes no obligation on him to doubt what he would believe from the evidence as a man without having taken the oath, *held* not error, if not commendable in form.

From Deschutes: T. E. J. DUFFY, Judge.

In Banc.

A. J. Weston was convicted of murder, and he appeals. Reversed and remanded. See *State* v. *Weston,* 102 Or. 102 (201 Pac. 1083).

For appellant there was a brief over the names of *Messrs. Collier, Collier & E. F. Bernard,* with an oral argument by *Mr. Bernard.*

For respondent there was a brief over the names of *Mr. H. H. DeArmond, Mr. R. S. Hamilton* and *Mr. W. P. Myers,* with oral arguments by *Mr. DeArmond* and *Mr. Hamilton.*

BROWN, J.—Four places are frequently referred to in the testimony: the small town of Sisters, located in the Northwestern part of Deschutes County, Joe Wilson's sawmill, the Ben Tone place, and the cabin in which Robert H. Krug, an aged bachelor, the victim

of the alleged homicide, dwelt. The Wilson sawmill is situate about five and one-half miles northwest of Sisters. Wilson and Stilwell, leading witnesses for the state, and the defendant, were all living at the mill at the time of the homicide, but it is claimed that Wilson was at Bend on that night. The site of the Krug cabin is about three fourths of a mile from the sawmill, on the opposite side of a slough. The Ben Tone place is located about one mile northwest of the site of the Krug cabin and is the place from which defendant telephoned to central station, giving the first information of the fire. Ben Tone's house, the site of the Krug cabin, and the Wilson sawmill, are triangularly situate.

Prior to the occasion of the averred crime, the last person to see Krug alive was the defendant. Weston was at the Krug cabin either Saturday or Sunday night preceding Monday, March 24, 1919, the night of the fire.

The atmosphere at Sisters and vicinity on that Monday was quite clear. In the early night-time of that day, a number of persons saw unmistakable evidence of a fire in the vicinity of the Krug cabin. On the following forenoon the defendant telephoned Mrs. Nettie Cobb, the operator at central station, that the Krug cabin had been burned. He suggested foul play, and requested that the officers be notified. Upon the arrival of the officials, a coroner's inquest was held, the defendant serving as one of the jurors, but the record does not disclose that he gave any testimony. The chief witness in this case, George Stilwell, was present, but did not testify, neither was Joe Wilson, who arrived before the conclusion of the inquest, examined as a witness. The record does not

disclose the finding of that coroner's jury, except that it is suggested that it found that Krug was dead.

For more than a year and half the two leading witnesses in this case, and the defendant as well, maintained a rigid silence concerning all their knowledge, if any, of the criminal act that took the life of Krug. About twenty months after the death of Krug, George Stilwell was in the employ of the Knight Packing Company, of Portland, Oregon. About that time, Joe Wilson was released from the county jail, where he had been serving a sentence of the federal court for the illicit manufacture of intoxicating liquor. He called upon Stilwell and advised him that their lives were in peril on account of their knowledge of the defendant's crime in slaying Krug, and that for mutual safety they should testify to the defendant's guilt. Upon his return to Deschutes County, Wilson was called into the office of the sheriff of that county and disclosed to that official what he claimed to be the facts regarding the death of Krug. Thereupon a complaint was sworn to and a warrant issued for the arrest of Weston, who was found at his ranch a few miles distant from Sisters. The warrant served, a preliminary examination was given him, whereupon he was held to answer. He was afterwards indicted by the grand jury of Deschutes County, and, upon trial, convicted of murder in the second degree.

Upon his first trial, the defendant was convicted on the theory that he slew Robert H. Krug, burned his cabin, and confessed his crime to Joe Wilson and George Stilwell, the state's principal witnesses in the former, as in the second, trial of this cause. The alleged confession was corroborated by such other independent testimony, if believed by the jury, as tended to connect the defendant with the commission of the

crime. Upon appeal it was urged that the evidence adduced at the former trial was insufficient to prove the *corpus delicti*. We held that the trial court did not commit error in overruling defendant's motion for a directed verdict of not guilty, for the reason that "by the evidence adduced upon the trial, the state made out such a case that the duty of submitting it to the jury was imposed upon the court"; that the credibility of the witnesses, the weight, effect and value of their testimony was exclusively for the determination of the jury; and, that "the testimony admitted at the trial, if believed by the triers of fact, authorized them to return a verdict of guilty." But the case was reversed on other grounds.

Much of the alleged error in this trial involves the accomplicity of George Stilwell, one of the chief witnesses for the prosecution, in the commission of the alleged crime of murder. According to the testimony herein adduced, Stilwell and Wilson suppressed material evidence at the first trial. At the second trial, Stilwell testified that he was present with the defendant at the cabin of Robert H. Krug at about the hour of 7:30 or 8:00 o'clock P. M. on the twenty-fourth day of March, 1919, when the defendant assaulted, robbed and slew the deceased; that at the first trial he suppressed the testimony of his presence there through fear that he would become implicated in the homicide. He further testified that at the time of the first trial Joe Wilson knew of his presence at the Krug cabin when the crime upon the body of Robert H. Krug was committed. The other leading witness, Joe Wilson, at the former trial, refrained from testifying to any matter that would indicate that Stilwell was present at the cabin at the time of the alleged killing of Krug. Upon the second trial

Wilson, in testifying to Weston's confession, swore upon the witness-stand, among other things, that at the mill, in the presence of Stilwell, the defendant said:

"He [Weston] said he and Stilwell went over there this night, the 24th * * . He said they went in the house and the old man [Krug], I think, was eating supper, and the old man came in at the door from eating supper and he [Weston] hit him with a stick * * . Weston told him, 'You caught us moonshining and went down town to Sisters and told it all around. We have got to leave the country and have to have $500 * * .'

"Q. When did you first know Stilwell was connected with this murder?

"A. Weston told me on the 25th. * * He said Stilwell was with him.

"Q. That was the night following the inquest, was it not?

"A. Yes. * *

"Q. On that night when you got home, Weston then told you of Stilwell's connection with the murder?

"A. Yes, sir. * *

"Q. Did he at that time tell you of Stilwell's connection with this murder?

"A. He told me Stilwell was over there with him."

Wilson gave the following reason for suppressing all knowledge concerning the presence of Stilwell at the scene of the commission of the crime when testifying as a witness at the former trial:

"Q. Why, if it is true, why, Mr. Wilson, when you testified under oath at the former trial, didn't you tell that fact, if it is a fact?

"A. You want to know why?

"Q. I have asked you.

"A. You want my reason?

"Q. Why didn't you tell Stilwell's connection with it?

"A. Well, sir, I will tell you. I figured just like this: no matter what part Stilwell might have taken over there, that he was in no way responsible for it. He had been drinking there for eight or ten days, all the time, day and night. He was a weak-minded man, weak-bodied, and I just figured, knowing the two men like I did, Stilwell wasn't in any way responsible for anything that might have happened."

Another reason assigned by Wilson was that he was afraid of Weston in the event that the defendant was not convicted. He further stated:

"I was making whisky myself and I could not tell it very well without exposing the business I was in, or had been in."

Weston said, as a witness, that he was of the age of about 54 years; that he was acquainted with George Stilwell; that at the time of the homicide he was the owner of a small ranch located a few miles distant. Relating to his business at the mill, he testified:

"There was a bunch of us farmers hired Joe Wilson and his mill, paid him a certain amount per thousand, and we furnished our own help and we cut the timber from the reserve and placed it in the mill and sawed out our piles of lumber, I think about ten of us";

that while at the mill he saw Robert H. Krug a number of times, and that he last saw Krug, according to his recollection, on the Saturday or Sunday evening before the fire, which occurred on Monday night.

"Q. Well, during the few days prior to this fire, did you have any knowledge of any kind or character that it was claimed by anybody that Robert H. Krug had been over to the sawmill and caught George Stilwell washing out some tubs or vessels pertaining to moonshining operations?

"A. Not to my knowledge.

"Q. Did George Stilwell ever tell you of any such thing?

"A. No, sir; he didn't.

"Q. Did you ever see Robert H. Krug catch him in any operation of that kind?

"A. No, sir; I didn't. * *

"Q. To the best of your recollection, what did you do on Saturday prior to the fire?

"A. Well, if my memory calls me right, I went to Sisters after groceries * * ."

He testified that upon his return to the sawmill at about 5 o'clock in the evening, Stilwell and Krug were there; that Krug remained there and took supper at the mill; that Stilwell washed the dishes and that he (Weston) walked home with Krug for the purpose of getting eggs; that he remained at the Krug place about five minutes.

Some of the witnesses testified that Weston was in Sisters on Sunday and that he had inquired as to whether Krug had been there, while W. N. Cobb testified that Weston said he was with Krug on Sunday preceding the fire at his cabin and knew that he was all right on that day.

We have seen that the cabin was burned on Monday night, March 24th. The defendant, in accounting for his movements on that day, says:

"If I remember right we [Stilwell and Weston] sawed logs in the timber that day, felled trees, trimmed, bucked logs for to be hauled in the pond for the purpose of sawing into lumber. In the evening, possibly between sundown and dark, we always brought in our tools, generally, or the most of them. We came in by the way of the barn, from the West. Libby Combs, if I remember right, was there * * [Libby Combs "is my wife at this time"]; * * I and her stood there and talked a little while and leisurely walked over to the bunk house * * until he [Stilwell] called us to supper. * * We went in and ate supper, and we excused him * * and we washed the

dishes and put them up, and went from there back to the bunk house.

"Q. And were you away from the sawmill that night?

"A. No, sir."

The witness says he went to bed at 9:30 or 10 o'clock; that he arose about 7:30, possibly 6:30, on the following morning; that after breakfast he took a bucket and went over "to Mr. Krug's * * to get eggs." In describing his approach to the Krug cabin, he testified:

"After I went out of the timber into this slough, possibly 150 or 200 yards of the house, I discovered smoke, * * and then * * I noticed the chimney standing alone. That was the first thing that I discovered in the way of ascertaining that there was a fire there, and I went on up until I got possibly into, I judge, 30 feet of the house * * , and I seen the ruins * * . On the southeast corner there was a little ridge there. On the southwest corner there was a little mound there. The one on the west was larger than the one on the east, and over the other side of the house sat a dog howling. Of course, that aroused my suspicions that there was something wrong. * * I wondered what it could be unless he might be burned in the house, naturally, and I said I had better not go any closer because it would not be proper for me, under the circumstances, and I turned around and go back to the telephone, to notify the authorities of what I had found. * * I went from there to Ben Tone's, which was in a northwestern direction, * * and rung up central. * * I told Mrs. Cobb [central operator at Sisters] that I had found the cabin burned down and that I was afraid that he [Krug] might be burned up in it, or at least something wrong, and I found it was necessary for to notify the authorities";

that from the Tone place he went back to the sawmill and told Stilwell what he had found; that later he

returned to the site of the Krug cabin and found Nute Cobb and Charlie Hindman; that soon thereafter the sheriff, district attorney and coroner arrived and an inquest was held. Weston denied all knowledge of, or connection with, the homicide. He also denied all threats and declarations against interest that had been received as evidence against him. A transcript of his testimony given at the former trial, introduced as evidence in the second hearing, discloses that at the former trial Weston claimed that he was at the mill during the entire night-time of that fateful Monday; that he ate supper with Stilwell and Libby Combs, who afterwards became his (Weston's) wife, and that they then played cards during the remainder of the evening until the lady went home, when Weston and Stilwell retired to their beds in the bunk house.

Weston testified that liquor was being illicitly manufactured at the mill; that George Stilwell was the distiller, and that he knew the purpose for which Stilwell was there.

Stilwell related the story of his presence at the Krug cabin on the night of the homicide, as follows:

"He [Weston] told me along about half-past 3 or 4 o'clock I had to go with him. * * He said if I didn't go he would kill me first and then he would go and get Krug's money and the people would always think I got it. * *

"Q. Had you talked about it before the day?

"A. We talked about it the day before [Sunday]. He said that Krug had reported us for moonshining and if we didn't get rid of him, why, he would get us first, and he said Krug had quite a lot of money buried over there and while we were getting rid of him we could get his money, too, at the same time. * *

"Q. What did you tell him about the killing, if anything?

"A. I told him I would not do it, I was afraid to do it; I could not do anything like that. He said, 'You won't have to do it yourself.' He said, 'I will do it, but,' he said, 'you will have to go along with me.' * *

"Q. How did you come to go with Mr. Weston on that trip * * ?

"A. Well, he told me he would kill me if I didn't go, and I was afraid."

He testified that he and Weston walked together from the mill to the Krug cabin, a distance of about three quarters of a mile.

"Q. What did you go there for?

"A. I went over because I was forced to go.

"Q. Did you try to get away at the time?

"A. I was afraid to try to get away.

"Q. What were you afraid of?

"A. I was afraid of Mr. Weston. He told me he would kill me if I didn't go with him."

In his cross-examination he said, in relation to the conflict in his testimony:

"I don't know if you would call it false or not. I knew if I answered the question and said I was at the cabin that night, I knew it would get me implicated in the trouble and keep me away from home.

"Q. Then were you testifying falsely on that account?

"A. I was trying to keep myself out of it; yes, sir. * *

"Q. Then what was your reason for testifying as I have indicated here? * *

"A. I have told you.

"Q. For the purpose of protecting yourself?

"A. Yes, sir; not only myself, but my wife."

At the preliminary hearing on the fifth day of October, 1920, Stilwell testified that Weston "left the place the night of the fire and went away for three or four hours, and I laid down and went to sleep and

he came back about 9 o'clock." At the second trial
he was asked if that statement was true or false; and
he answered:

"Well, it must be false. * *
"Q. Why did you testify falsely there?
"A. If I told them at that time I went in with
him, I would get in trouble. I was protecting my
wife, and myself as well."

The defendant asserts that George Stilwell was an
accomplice, and that the court should have so charged,
as a matter of law. If Stilwell was an accomplice in
the crime for which the defendant was being tried, he
was not a witness entitled to full credence under Section 1540, Or. L.

We have defined the term "accomplice" to mean a
partaker in the commission of a crime: *State* v. *Turnbow,* 99 Or. 270 (193 Pac. 485, 195 Pac. 569). The
court, in that case, called attention to Wharton's
definition, approved by the court in *State* v. *Roberts,*
15 Or. 187, 197 (13 Pac. 896, 901), reading:

"An accomplice is a person who knowingly, voluntarily, and with common intent with the principal
offender, unites in the commission of a crime."

That definition was peculiarly applicable to the
facts in the case of *State* v. *Turnbow, supra.* Turnbow was the chief actor in that near tragedy. Catharine Moss aided and abetted by making an appointment to meet the victim so that Turnbow might rob
him.

In *State* v. *Kellar,* 8 N. D. 563 (80 N. W. 476, 73
Am. St. Rep. 776), the court, speaking of the Wharton
definition of "accomplice," said:

"While this definition has often been quoted and
is strictly accurate in the great majority of cases, it
is not, we think, universally accurate. Two persons

may be equally guilty in the commission of a crime, may both be present and equally participate in its commission. As between them, there can be no 'principal offender,' yet each is the accomplice of the other. We prefer Black's definition: 'an associate in crime; one who co-operates, aids or assists in committing it.' "

1. The term "accomplice," in this case, includes all persons who were concerned in the commission of the murder, and the grade of guilt of the witness is not important: Abbott's Law Dictionary.

2. The test by which to determine whether or not the witness in the case at bar is an accomplice of the defendant is this: Could he be lawfully indicted for the slaying of Krug, the offense for which the defendant was indicted and tried? *State* v. *Turnbow,* 99 Or. 270 (193 Pac. 485, 195 Pac. 569); *State* v. *Walters,* 105 Or. 662 (209 Pac. 349). To like effect are 12 Cyc. 446; Underhill on Criminal Evidence (3 ed.), § 125.

In the case of *State* v. *Case,* 61 Or. 265 (122 Pac. 304), the court held that there is no distinction between an accomplice as a witness and the same individual as a defendant.

3. The prosecution asserted that Stilwell's case had been passed upon by the grand jury of Deschutes County, and that he had been exonerated. That fact is not competent evidence of the accomplicity of the witness.

4. It is settled law in this state that, in a case where all the facts in relation thereto are admitted and no dispute is raised by the evidence, whether a witness is an accomplice is a question of law for the court to determine: *State* v. *Carr,* 28 Or. 389, 396 (42 Pac. 215), and cases therein cited; *State* v. *Edlund,* 81 Or. 614 (160 Pac. 534). But, where the facts are dis-

puted, accomplicity is a question to be submitted to the jury: *State* v. *Carr, supra; State* v. *Edlund, supra; People* v. *Creegan,* 121 Cal. 554 (53 Pac. 1082); *Hargrove* v. *State,* 125 Ga. 270 (54 S. E. 164); *Commonwealth* v. *Elliott,* 110 Mass. 104; *State* v. *Lawlor,* 28 Minn. 216 (9 N. W. 698); *State* v. *Kellar, supra.* See also *State* v. *Start,* 65 Or. 178, 181 (132 Pac. 512, 46 L. R. A. (N. S.) 266); *State* v. *Wong Si Sam,* 63 Or. 266 (127 Pac. 683).

The testimony of George Stilwell relating to the circumstances of the commission of the homicide, and his presence at the scene, was contradicted.

Under the state of the record, the court properly submitted to the jury the question of the complicity of the witness in the crime.

5. However, the court did err by instructing the jury that—

" * * If you believe from the evidence that the witness Stilwell participated in the commission of the murder of Robert H. Krug, if you find he was murdered, but that his participation was involuntary and actuated through fear, threats or coercion sufficient to cause him to believe he was in immediate danger of life and limb, then I instruct you he was not an accomplice and his testimony, if believed, is sufficient proof of any fact testified to, without corroboration."

The state, in support of the instruction, quotes:

"One acting under coercion is not an accomplice and need not be corroborated,"

and cites *People* v. *Miller,* 66 Cal. 469 (6 Pac. 99); *Beal* v. *State,* 72 Ga. 200. In *People* v. *Miller, supra,* the defendant was convicted of the commission of the infamous crime against nature upon the body of a lad thirteen years old. Obviously, in that case the boy was not an accomplice. *Beal* v. *State, supra,* in-

109 Or.—3

volves the complicity of· a boy of the tender years of
twelve in the crime of burglary, and has no applica-
tion whatever to the case at bar.    There are a number
of cases of like character in the books.·

There is no evidence in the record that warrants
the instruction above set out.    The acts committed
by Stilwell, even if under compulsion by threats of
future injury, uttered by Weston, were not involun-
tary acts within the meaning of the law of homicide.
We have read and reread the record in this case, and
fail to discover any evidence of compulsion other than
threat of future harm testified to by Stilwell.

6. Even in the commission of· crimes that may be
excused on account of threats or menace sufficient
to show that they had reasonable cause to, and did,
believe their lives would be endangered if they re-
fused, such danger must be, not one of future vio-
lence, but of present, impending and imminent violence
at the time of the commission of the crime: *People*
v. *Martin,* 13 Cal. App. 96 (108 Pac. 1034); *People* v.
*Repke,* 103 Mich. 459 (61 N. W. 861); 16 C. J., p. 91.

7. If George Stilwell did aid and abet in the slay-
ing of Krug, he cannot be excused or justified under
the plea of compulsion, necessity or coercion.    Our
statute denounces homicide as a crime.    It defines jus-
tifiable and excusable homicide: See Sections 1908,
1909, 1910, Or. L.    The terms "justifiable" and "ex-
cusable" homicide are often used as synonymous by
text-writers and in the decisions: *State* v. *Gray,* 46
Or. 27 (79 Pac. 53).    The above sections neither jus-
tify nor excuse the killing of an innocent third per-
son by reason of the slayer's fear caused by threats
of another.

Nor will the common law justify or excuse the·
participation of Stilwell, if he did co-operate in the
killing of Krug under compulsion of threats.

"Fear, duress or compulsion due to the act of another, seems to be considered no excuse for taking the life of a third person." 13 R. C. L., § 111, p. 807.

" * * The authorities seem to be conclusive at the common law, that no man can excuse himself, under the plea of necessity or compulsion, for taking the life of an innocent person." 8 R. C. L., § 100, p. 125.

To similar effect is 1 Encyclopedia Crim. Law (Brill), Section 166.

"Killing an innocent man cannot be justified or excused on the ground that it was done under threats and compulsion from third persons in order to save the slayer's own life. * * Nor, if unlawful, can it be justified by the fact that it was committed under the commands of another." 30 C. J. 89; 21 Cyc. 833.

To like effect is 2 Encyclopedia Crim. Law (Brill), Section 697.

"As a general rule one cannot excuse or justify himself under the plea of compulsion or necessity, for taking the life of an innocent person." 1 Michie, Homicide, p. 451.

See the interesting and very instructive cases of *Reg.* v. *Tyler,* 8 Car. & P. 616; *Reg.* v. *Dudley,* 14 Q. B. D. 273, 15 Cox C. C. 624; 6 Crim. Law Rep. 95, 264; *United States* v. *Holmes,* 1 Wall. Jr. 1 (Fed. Cas. No. 15383.

In *Arp* v. *State,* 97 Ala. 5 (12 South. 301, 38 Am. St. Rep. 137, 19 L. R. A. 357), it is said:

"The authorities seem to be conclusive that, at common law, no man can excuse himself under the plea of necessity or compulsion, for taking the life of an innocent person."

In *Bain* v. *State,* 67 Miss. 557 (7 South. 408), it was said by the Supreme Court of that state:

"The social system would be subverted, and there would be no protection for persons or property, if the fear of a man needlessly and cravenly entertained should be held to justify or excuse breaches of the criminal laws."

In *Leach* v. *State,* 99 Tenn. 584 (42 S. W. 195), a requested charge involving fear as a defense was refused, the court saying:

"If it be true that one of his co-conspirators was near by with a gun and in a threatening attitude toward the defendant, as the confession may indicate, that would work no diminution of his offense. In such a case, if, in fact, a real one, it was his duty to spare Hick, and, at the same time, protect himself by turning his weapon upon his threatening confederates. He could not, with any degree of legal palliation, elect a course absolutely safe to himself, and slay an innocent man, rather than take some risk to himself in an equal combat with a relentless companion."

See *State* v. *Fisher,* 23 Mont. 540 (59 Pac. 919); *State* v. *Nargashian,* 26 R. I. 299 (58 Atl. 953, 106 Am. St. Rep. 715, 3 Ann. Cas. 1026); *Rizzolo* v. *Commonwealth,* 126 Pa. St. 54 (17 Atl. 520).

"One attacked by a ruffian may kill him if he cannot otherwise preserve his own life. 'But,' says Russell, 'according to Lord Hale, a man cannot ever excuse the killing of another who is innocent under a threat, however urgent, of losing his own life if he do not comply; so that if one man should assault another so seriously as to endanger his life, in order to compel him to kill a third person, this would give no legal excuse for his compliance.'" 1 Bishop's New Crim. Law, § 348.

The relation of husband and wife is considered at common law to be such that a criminal act committed by the wife in the presence of her husband is presumed to be done, not of her own free will, but under coercion, and is therefore excusable. But—

"The presumed coercion has never been recognized, however, as a defense to the wife in crimes involving a high degree of criminality, such as that of murder." 1 McClain on Crim. Law, § 146.

In 1 Wharton's Criminal Law, at Section 383, it is written:

"It would be a dangerous rule if the defendant could shield himself from prosecution for crime by merely setting up a fear from or because of a threat of a third person."

8. But the presence of a terrified onlooker or his failure to report a homicide does not constitute him an accomplice: *Commonwealth* v. *Loomis,* 267 Pa. St. 444 (110 Atl. 257).

Did Stilwell aid and abet Weston? His fear of Weston is not relevant, because, says Blackstone:

"Fear and force shall not acquit him of murder, for he ought rather to die himself than to escape by the murder of the innocent." Blackstone's Com., § 30.

To approve the court's instruction in this case is tantamount to announcing another and an additional ground upon which to justify or excuse the taking of life. We shall not do that. Human life is the most precious thing committed to the protection of the law. Stilwell, as aider and abettor (if he be such), cannot lawfully shield himself from criminal responsibility in the murder of Krug, an innocent third person, upon the ground of fear for his own life-blood because of the threats of Weston.

9. We have already seen that the law makes no distinction between an accomplice as a witness and such party as a defendant: *State* v. *Start, supra;* Underhill, Crim. Ev. (3 ed.), § 125.

10. If Stilwell participated by aiding and abetting
in the criminal act of slaying Krug, although he was
"actuated through fear, threats or coercion" of "im-
mediate danger to life and limb" from Weston, he was
an accomplice under the provisions of our Code (Sec-
tion 2370, Or. L.), reading:

"All persons concerned in the commission of a
crime, * * and whether they directly commit the act
constituting the crime, or aid and abet in its com-
mission, * * are principals * * ,"

and his testimony is not "sufficient proof of any fact
testified to, without corroboration." Section 1540,
Or. L.

11. Error is assigned because of the introduction
and receipt into the record as evidence on redirect
examination, over the objection of the defendant, of
a statement made by Stilwell when under arrest in
Multnomah County, which statement contained ques-
tions put to him by the officers and his answers there-
to. The narration given by Stilwell consists of about
37 pages of typewritten matter and contains many
statements that are prejudicial to the defendant,
unless competent under the provisions of Section 711,
Oregon Laws. No part of that document was offered
in evidence by the defendant, but his counsel did read
into the record a number of questions and answers
contained in that statement, by questions put to the
witness Stilwell for the purpose of impeachment.
Such questions related chiefly to Wilson's knowledge
of the circumstances surrounding the homicide, as told
to him by Stilwell. We quote extensively from the
document for the purpose of illustrating the nature
thereof. Space alone forbids our setting it out in
full.

"Q. Is that your signature, Mr. Stilwell [indicating]?

"A. Yes, sir, that is my signature. * *

(Mr. Collier, Reading from Statement: " 'Q. Did you make a full statement at that time to Joe about your complicity in the thing? Did you tell Joe about it yourself?

" 'A. Joe and I together?

" 'Q. Yes.

" 'A. Would that make any difference?

" 'Q. I just wanted to know about it.

" 'Mr. Christoffersen: You are telling it all, you might as well tell the whole thing.

" 'A. I don't want to get Joe into anything wrong.

" 'Q. Mr. Myers: It is not a question of trying to get anyone in wrong. We are just trying to find the facts.

" 'A. Yes, I told Joe several times. I have talked with Joe several times.' * *

"Q. Answer that question 'yes' or 'no.'

"A. Yes, I guess if it is there I made the statement, but I never did tell Joe all that is in this paper here * * .

"Q. I will ask you further and along the same line, on page 37 of the same paper, which has been signed and admitted by the witness to be his signature, and commencing about the top of the page:

" 'Q. Have you told us all now you want to tell us about the conversation you and Wilson had in regard to the trial coming up and your end of the case?

" 'A. Yes, I can't remember now. We have talked it over several times. Wilson always told me he knew very well I would not do anything like that, and if I was with him [Weston] I was forced into it, and naturally he didn't want to implicate me into it so as to cause me any trouble.

" 'Q. That is why he did not testify to that in the court, is that it?

" 'A. Yes.

" 'Q. He did not want to get you into trouble?

" 'A. Yes, he didn't want to get me into trouble.

" 'Q. He told you he would testify that way?

" 'A. Yes, he told me he didn't want to get me into trouble, but he didn't tell me how he was going to testify.

" 'Q. He knew, then, you were going to testify as you did?

" 'A. I think so. * * '

"Q. Did you make that statement?

"A. Yes, sir."

(Redirect examination by Mr. Myers:)

"Q. Now, Mr. Stilwell, I am going to start in with this so-called statement, a part of which has been read to you. * * I am going to read these questions and answers and ask you if you made those questions and answers, as you remember it, in this statement signed by you. * * I expect to go through the entire thing.

" (Objected to and an exception allowed to the court's ruling.)"

The record shows that after Mr. Myers read to the jury from the statement a number of preliminary inquiries by Mr. Christoffersen to the witness Stilwell at the jail, the defendant objected, and, stating to the court that he didn't want to be interrupting the proceedings by repeating objections, said:

"May it be understood an objection and exception goes to each and every part of that statement?

"The Court: Yes, it will be understood."

The transcript shows that the counsel had previously, in support of an objection, pointed out to the court the reason why the statement in its entirety was objectionable, and that if any portion of that statement referred to or explained any of the matters or portions of the document read into the record by the defendant, then, in such event, the defendant had no objection to any such part of the statement, but did object to all the portion of the record not on the

subject inquired into by the defendant.   The prosecution then proceeded to read the entire statement, some of which is as follows:

"Q. I would like to have you tell your own story to the reporter and he will write it down; just how you met Weston, when you first met him, under what conditions you met him, and what you were doing at his place, how it came about that he got it in for this man Krug; how he forced you into helping him commit that crime under threat of death to yourself.   Go ahead and tell that in your own words.

"A. From the time I met him at Bend?

"Q. Yes, until the time it was all over with, and about Wilson and you, and your conversations after the trouble, the murder and the burning up of the body.

"A. Yes.

"Q. If you will just tell that to him [reporter] so that he can write it down in your own words.   Just take your time.

"A. I met Wilson and Weston at Bend, Oregon * * . They said they had been trying to make some whisky down at the sawmill and they wanted to know if I could come down and show them how to make it, and I told them I would.   They didn't want anybody to see me leave town with them. * * So I fixed up everything and we started to operate. * * Wilson went to Bend and Krug came by and he caught me behind the boiler washing the tub out and he says, 'What are you doing?' I said, 'I am doing some washing. ' * * *

"Q. (Interrupting.) * * Was Weston there?

"A. Yes. * * So another time * * he caught me there again and he asked me, 'Are you still washing?' and I told him, 'Yes.' * * Weston got pretty mad at him at that time.   Krug went to Sisters * * in a roundabout way. * * Weston thought he went to Sisters to report us and * * said, 'We will have to get rid of that old man some way or he will report us for moonshining and we will be in for ·it. * * Let's go over and get rid of the old man, and while we are

doing that we can get his money at the same time.'
He says, 'The old man must have money buried there
because he never spends it, and I know he had money.'
* * So the next day * * he asked me to go over with
him again. * * He said, * * 'If I have to go by
myself, I will fix both of you. I will fix you and
Krug both.' * * I didn't know whether to go or die
or be killed. So he had quite a lot of moonshine
whisky there and I took several drinks and we got out
on the road and he had some more whisky and I took
some more to drink * * . So when we got there
[Krug's place] * * , the old man says to him, 'Go
on in by the fireplace * * ; I will be right in.' * *
Time was between 6 and 8. * * The house was burned
down about 8 o'clock. Just as the old man came
in he hit him in the head and knocked him down, with
this hardwood club. That is what he took along to
hit with. * * He pulled this rope out and he said,
'You take this rope and tie him.' * * I took the rope
but I couldn't tie him, so he took the rope and tied
him himself. * * He [Weston] told me, 'You take
that shoe off.' So I started to, but I know I didn't
take it off. I started to take it off. The old man
said, * * 'If you are going to kill me, kill me quick.'
* * Weston said, 'Tell me where your money is.'
He drawed it [the rope] up again, and loosened it
up, and the third time he drawed it up he killed him,
smothered him, and then he made me help put the
old man on the couch. He says to me, 'Now, if this
is ever given away on me, if you ever tell this, I will
do you the same way. * * If I don't, I have got
friends that will.' * * Then we went on back to the
cabin, where we were stopping, and went to bed.

"Q. Just a minute. Did you do something else
after you laid him on the bed?

"A. There was some magazines or papers or some-
thing piled up in the corner to the left of the fireplace,
you know, as you are facing the fireplace, to the
left; so he set those papers on fire.

"Q. Did he do that with the intention of burning
the house and the body so as to cover up the murder?

"A. Yes, to cover it up. * * He threatened me

three or four or five times before we got over to the cabin where we were stopping. * * The next morning I got up and went down to cook some breakfast * * He came down, and I says to him, 'I smell meat burning.' So he looked at me and laughed and said, 'I expect it is Krug's'; and he said, 'I will take this bucket and go and get some eggs,' and he went on, * * just like it had never been done. * *

"Q. Didn't you and Wilson have it fixed up between you just what you were to testify so as to protect you in this case?

"A. To a certain extent; not all of it, though. * * I know we had a conversation together and I told him I was afraid I would get into it myself, so he said, 'Now, you just go ahead and use your own judgment about it, but we have got to get rid of that man [Weston], and if we don't he will kill us. * * If he finds out he has to go over the road he would just as soon go over for three murders as one. * * He will kill both of us.'

"Q. Now, let us get back again to the day of the murder. That afternoon when Wilson was in town, and you and Weston were there. How did he propose to you at that time the way you should kill him, and how you should do it?

"A. He told me just the way he did do it.

"Q. Take this club?

"A. Yes.

"Q. Knock him in the head?

"A. Yes.

"Q. Tie him up?

"A. I didn't know that he would tie him up. He said he would tie that rag around him.

"Q. Did he say he would burn up the cabin to cover up anything?

"A. He said that is the way we would do it. He said he would tie the rag over his face on account it never showed no signs, in case the cabin never burned, I suppose.

"Q. What time of the afternoon was it that you planned that? Before supper?

"A. Yes.

"Q. Then you talked about it, too, at the supper table?

"A. Well, he started to plan it before supper. Yes, he talked about it after supper, too, and then after supper it was getting dark and he got everything ready; that is, the rags * * and the rope. * * The club was out at the mill * * .

"Q. You didn't go the road you usually go * * ?

"A. He wanted to get in the grass so they couldn't see his tracks. * * He [Krug] came to the house. * * We were standing there waiting for him."

After describing the assault upon Krug, witness testified:

"The old man told him he had some money upon a little shelf there * * Then he [Weston] went over to this little shelf and got this money and some papers, and I thought maybe at that time he probably got this note at that time. * * Anyhow, he got $16. * *

"Q. When he [Weston] had him down on the floor, is that when he told you to take off his shoes?

"A. Yes * * . I didn't get his shoes off. I got them unlaced, but I didn't get them off. * *

"Q. Didn't he say, 'We had better burn the house,' or something like that?

"A. No, he said he was going to burn the house before we went over there.

"Now, we will get back to the house: Q. And you did not see the dogs?

"A. No, I didn't see the dogs until the next morning; and the bitch came over there howling.  ·

"Q. What happened?

"A. I threw some feed out to her, and he said, 'Don't throw feed out to that damned bitch. You had better take a club and kill her.' And she came over there some time * * after that, so he took a hammer out of the house and went over there. I didn't see him do this, but he came back and told me he called her up to him and knocked her in the head with the hammer; and he said, 'That is the last of the Krug family.' * * He said that was the last of the family,

the two dogs burned up and he knocked this dog in the head. * *

"Q. What did you go over there with him for, George?

"A. I was afraid. I thought he would kill me as sure as the devil. * *

"Q. Didn't the old man do any struggling after that was tied up the last time? Didn't he squirm?

"A. Yes, he squirmed, but he couldn't get away on account of that rope. * * He [Weston] said, 'We had better stay here until this house gets in full flames, because I have seen fellows play possum, make on like they were dead when they weren't.' * *

"Q. Did you ever leave the cabin after that, alone * * ?

"A. I came to Bend * * alone * * . He [Weston] came as far as Hindman's with me. I was scared that day, but I stayed a certain distance away from him so if he did make a break I could run. * * I was scared that day. I was afraid he was going to do something, but I had to get away from there some way.

"Q. How much tying of his hands did you get done?

"A. I wrapped the rope around and then it slipped off again. * *

"Q. Now, when you went over there, George, after you and he [Weston] had talked the thing over that evening both before and after supper, what did you do, if anything, toward trying to keep him from going?

"A. I told him several times that I would not go with him, so then along towards the last I didn't think he would do it. * * To try to please him I went. I was afraid not to do it. If he [Weston] tells you he is going to do anything, he is just as liable to do it as not. He is liable to catch you out some time and fix you. I knew he was that kind of a man, because I always heard he was. * * "

The statement shows certain inquiries put to the witness relating to a woman by the name of Combs

who since the commission of the alleged homicide was married to the defendant. The witness (Stilwell) in speaking of her, said:

"She says to me over here at the Knight Packing Company * * , 'You know you lied about that.' She said, 'We were playing cards in there the night the house burned down.' Told me right there to my face.

"Mr. Roberts: That was their alibi. You were all playing cards when the house was burned.

"Q. Was she there?

"A. No, she was not * * ."

"Mr. Myers: Now, George, I have read you the full and complete statement which you signed in Bend which was given before the court reporter, Mr. Christoffersen, Mr. Roberts and myself, and one or two other gentlemen whose names I can't remember, in Portland, Oregon. Is that statement substantially correct, as you remember it, and did you try to give it to the very best of your recollection?

"A. Yes, sir; it is, as far as I know."

We assume for the purpose of this case that the reading of a portion of that statement to the witness in the form of questions and answers thereto constituted a giving of that part of the writing in evidence. Even so, would the prosecution be warranted in introducing any greater portion of that writing in evidence than that which went to explain and elucidate the part thereof that was received into the record upon defendant's offer? We think not. The statute is plain and the reason clear, and the decisions of this court are uniform in support of our opinion. It is provided at Section 711, Or. L., that:

"When part of an act, declaration, conversation or writing is given in evidence by one party, the whole on the same subject may be inquired into by the other * * ."

An exposition of that section of the statute is found in *Mahon* v. *Rankin,* 54 Or. 328 (102 Pac. 608, 103 Pac. 53). That case is authority for the proposition that when a conversation or writing, in part, is received in evidence from one party, the remainder of the writing or conversation, to be competent, must be material and affect in some way the part already given in evidence. This case is cited with approval in *State* v. *Mack,* 57 Or. 565 (112 Pac. 1079), and in *Richey* v. *Robertson,* 86 Or. 525, 534 (169 Pac. 99).

3 Wigmore on Evidence, Section 2113, in discussing the effect of such explanatory statements, says:

"The remainder thus received merely aids in the construction of the utterance as a whole * * . The single purpose of considering the utterance as a whole is to be able to put a correct construction upon the part which the first party relies upon, and to avoid the danger of mistaking the effect of a fragment whose meaning is modified by a later or prior part."

That excerpt is quoted with approval by this court in *State* v. *Mack, supra.*

Reading into the record as evidence the Stilwell narrative in its entirety was not only a restatement of the case for the prosecution on redirect examination by hearsay statements of fact, opinions expressed and comments made two hundred miles from the place of trial, but it contained statements of fact, opinions and comments that came into the record for the first time.

Prejudicial hearsay statements that shed no light whatever upon the subject matter introduced into the record from that document by the defendant are contained in that writing. Yet the prosecution insisted upon the introduction of the whole of that document, without regard to elucidation or explanation of that

part received as evidence from the defendant. The reason for the wise provision of Section 711, Or. L., was not considered.

To illustrate the incompetency of the document as a whole, we refer to the following as a fair sample of the matter contained therein.

Through the Stilwell hearsay narrative, the jury are told for the first time that Weston went through the murdered man's pockets. Through the hearsay narrative offered and received on redirect examination, the jury learn for the first time that on the day following the slaying of Krug his dog came to the Wilson sawmill; that Weston directed Stilwell not to "feed the damned bitch," but to "knock her in the head," and upon Stilwell's refusal to kill her the defendant later called her to him, knocked her in the head with a hammer and said to Stilwell, "That is the last of the Krug family." Through the hearsay statement, the jury are informed for the first time that on the morning following the commission of the crimes of arson and murder, when Stilwell said, "I smell meat burning," Weston laughed and replied, "I expect it is Krug's." In that narrative, Stilwell states his opinion as to when and how Weston obtained possession of a promissory note, the property of Krug, the possession of which, if true, is a very damaging circumstance against the defendant. By hearsay, the character of defendant is described thus:

"He is likely to catch you out some time and fix you. I knew he was that kind of a man, because I always heard he was."

The statement made and signed by Stilwell was not competent against Weston, except as to the whole of the matter explaining, construing and affecting that

part of the subject matter of the writing introduced by defendant.

A safeguard provided against hearsay evidence, that shelters alike the strong and the weak, the innocent and the guilty, is:

"In all criminal prosecutions, the accused shall have the right * * to meet the witnesses face to face * * ." Article I, Section 11, Oregon Const.

"The right of confrontation is the right to the opportunity of cross-examination." 3 Wigmore on Ev. (2 ed.), § 1365.

We cannot hold the introduction of that hearsay narrative to be legal, because such a holding would ignore our Constitution. We have neither the power nor the inclination to pursue any other course than to uphold our fundamental law.

This disposes of the serious questions in this case.

12. Error is predicated upon this instruction:

"A witness who is intentionally false in a material part of his testimony is to be distrusted in others."

It is argued that a mistaken witness is a false witness, within the meaning of Section 868, subdivision 3, Or. L.

The court's charge is supported by the authority of *Simpson* v. *Miller,* 57 Or. 61, 62 (110 Pac. 485, Ann. Cas. 1912D, 1349, 29 L. R. A. (N. S.) 680). This court held, in effect, in that case, that a witness must be false intentionally in order to constitute such person a false witness. Hence, in this jurisdiction, a false witness is one who utters a conscious falsehood.

The court's discretion was not abused by permitting leading questions: *State* v. *Oden,* 69 Or. 385 (138 Pac. 1083).

13. The map of the Krug premises was properly received in evidence: *State* v. *Casey* (Or.), 213 Pac. 771, and the Oregon cases there noted.

14. The court's elucidation of the phrase "reasonable doubt" is criticised.

As stated by the Supreme Court of California, in *People* v. *Bickerstaff,* 46 Cal. App. 764 (190 Pac. 656):

"Trial judges should adhere to the well-established precedents in framing or approving instructions on the subject of reasonable doubt, and should avoid any attempt to frame new definitions of the term."

However, the weight of authority is to the effect that the oath taken by a juror imposes no obligation on him, as such juror, to doubt what he would believe from the evidence, as a man, without having taken an oath: *Spies* v. *People,* 122 Ill. 1 (12 N. E. 865, 17 N. E. 898, 3 Am. St. Rep. 320); *Reed* v. *State,* 66 Neb. 184 (92 N. W. 321); *People* v. *Zajicek,* 233 Ill. 198 (84 N. E. 249); *Watt* v. *People,* 126 Ill. 9 (18 N. E. 340, 1 L. R. A. 403); *State* v. *Louie Moon,* 20 Idaho, 202 (117 Pac. 757, Ann. Cas. 1913A, 724); *Perry* v. *People,* 38 Colo. 23 (87 Pac. 796); *People* v. *Worden,* 113 Cal. 569 (45 Pac. 844).

For the reasons hereinbefore stated, this case is reversed and remanded to the lower court for further proceedings in accordance with law.

Reversed and Remanded.