THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* JUAN SARRIA PACHECO, Defendant and Appellant.

No. 8363. Argued January 15, 1941.—Decided January 21, 1941.

*A. Reyes Delgado, P. Santos Borges* and *F. Quirós Méndez* for appellant. *George A. Malcolm, Attorney General,* and *R. A. Gómez, Prosecuting Attorney,* for appellee.

Mr. Justice De Jesús delivered the opinion of the court.

Juan Sarria Pacheco and Carmelo Berdecia were insular policemen stationed at Ponce on or prior to January 1, 1936. Both of them were charged with murder in the second degree for the killing of Alesso Martinó. Sarria Pacheco, after being tried separately and convicted of the crime charged against him, was sentenced to a term of 12 years in the penitentiary at hard labor. There is no controversy as regards the facts, except as to a phrase spoken by the policeman Berdecia to which we will refer later on.

According to the evidence, on the night of December 31, 1935, the deceased Martinó wounded an individual named Américo Delgado and then hid in a room of the Hotel Hogar of Ponce. On learning of that fact the policeman José F. Cordero decided to arrest Martinó, and then went to the Hotel Hogar, entered the room where Martinó was, took him out of there by force, and while they were going down the stairway of the hotel, struggling, for Martinó resisted the arrest, the policeman had to strike him with his club in order to subdue him and then they grappled with each other and Martinó inflicted two wounds on the policeman with a pick he was carrying. Cordero, due to the wounds received by him, could not subdue Martinó, who then fled. When the policeman Sarria learned of the occurrence, he pursued Martinó in an automobile and, upon overtaking him, he alighted from the vehicle and, despite the fact that Martinó told him not to beat him that he was ready to give himself up, he struck the prisoner numerous blows with his club, inflicting on him several wounds and bruises in the forehead and in other parts of the body. Some persons who accompanied Sarria in the vehicle intervened and succeeded in making him stop beating Martinó who, bleeding profusely, was taken by the policeman Sarria and his companions to the Tricoche Hospital at about two o'clock in the morning of January 1, 1936. No physician could be found in the hospital, as the one assigned for duty at that time was in a dance in the

Club Deportivo, for which reason they had to leave Martinó on a stretcher in the second ward of the hospital while the physician was made available. Shortly before the arrival of Martinó, the policeman Cordero had been brought in and placed in the first ward of the same hospital. While Martinó lay on the stretcher, complaining of the blows received and bleeding profusely, Sarria was also in the same room by his side, waiting for him to receive medical attention in order to take him to jail. The policeman Berdecia came in, saw his comrade Cordero and Martinó wounded, and then went out with the chauffeur of the hospital ambulance and one or two other persons in search of the physician at the Club Deportivo, since all efforts made to locate him by telephone had failed. As there were several automobiles in front of the Hospital, it took the chauffeur some time to start his vehicle. After they had already started in the direction of the Club Deportivo, the policeman Berdecia told the chauffeur: "Stop, I am going to kill that scoundrel." They tried to prevent Berdecia from going back but he at last succeeded in doing it, and his companions followed him. When he arrived at the ward where Martinó was, he said: "Where is that thug?" and then Berdecia put his hand on his revolver and told the policeman Sarria: "If you do not kill him, I will." Thereupon Sarria took out his revolver and fired a shot at Martinó, who was in the stretcher, and said, "It is done." Then Berdecia and Sarria went out of the room where Martinó was and one of the witness saw Sarria throwing away something which he had taken out of the revolver, and next morning there was found in the grounds surrounding the building the revolver cartridge which was later introduced in evidence. Two hours after receiving the bullet wound, Martinó was taken to the Clinic of Dr. Pila where he was attended by Dr. Passalacqua. Notwithstanding the efforts made by said physician, the wounded man died in the afternoon of the same January 1, in con-

sequence of an internal hemorrhage produced by the bullet which perforated the channel of the backbone.

██ The appellant maintains that the trial court erred in permitting Juan L. Oliver to testify as an expert on ballistics, because as claimed by the appellant he had not been duly qualified as such expert, and he also urges that it was error to admit in evidence the cartridge and the bullet said to have been extracted from the body of the victim Martinó.

Really, we fail to understand what was the purpose sought by the district attorney and why was so much time wasted in introducing such an unnecessary evidence. All the witnesses agreed that only one shot had been fired and that it had been fired by the defendant Sarria. Teresa Veve, the nurse who received Martinó upon his arrival at the Tricoche Hospital, testified that the latter had several bruises on the head and some scratches in the abdomen and that he had no bullet wound, and that she was certain of this because she had examined him as soon as he arrived at the hospital (Tr. of Ev., p. 102). The defendant himself admits that it was he who fired the fatal shot, but he attempts to justify the homicide setting up the defenses which we will discuss later on. In these circumstances, what need was there to introduce evidence in order to prove that the only bullet fired —and which the defendant admits having fired—could have been from no other revolver than the one held by the accused himself? The introduction of this evidence would be explainable if Sarria had denied having fired the shot, or if admitting it, evidence had been presented to show that other persons had fired weapons, in which case some doubt might have arisen as to the identity of the killer.

As the said evidence was absolutely unnecessary, there is not the slightest possibility that it could have prejudiced the accused in any way. That being so, even conceding for the purpose of this discussion that the said evidence was not admissible for the reasons stated by the appellant, the error,

if any, in admitting the same constitutes no ground for reversal. Section 142 of the Code of Civil Procedure.

There was also offered and admitted in evidence the stretcher on which Martinó was placed when he arrived wounded at the Tricoche Hospital. Really, we fail to see what light could this evidence give in this case.

 At the close of the evidence for the prosecution, the district attorney asked the court that the jury be taken to the Tricoche Hospital in order that, after seeing the place of the occurrence, they could better understand the evidence introduced. It was suggested that the witness Teresa Veve could point out to the jury the place which each of the persons mentioned by the witnesses had occupied. A controversy arose between the prosecution and the defense by reason of the fact that the defendant requested that Miss Veve should be instructed to confine herself to pointing out to the jury the places in question, and the district attorney objected maintaining that it would not be proper for her not to answer any questions which the jury might ask. Finally, the court made the following ruling:

"Well, the court directs the marshal to call the Plaza, by telephone at once, and ask that they send here to the court four public automobiles. It reconsiders its previous ruling and now decides to sustain the motion of the district attorney regarding the taking of a view, and the judge will accompany the jury together with the stenographer and Miss Veve to the Tricoche Hospital. It also places at the disposal of counsel for the defense and of the district attorney a vehicle to take them there too, and the view will be confined to having Miss Veve, in the presence of the judge, of the members of the jury, and of the parties, the stenographer reporting the proceedings, point the places where the various wards are located, the corridors, where the stretcher was—and what the attorney has said, as to which it has no objection. And while the court is there, the stenographer, the district attorney, and the attorney for the defendant, being present, if the latter desire to put any question to Miss Veve in the presence of the jury, they may do so and she may point out, as she did here, exclusively where she, Berdecia, and the wounded man were. So that the view would be almost equivalent to the court

moving there, but only to provide for the case of any question being asked by any member of the jury who wishes to be advised on other facts and the question being taken down by the stenographer in order that if any party desires to object to it he may do so and the court may pass upon it right there.

"I think that that is more complete and it is a better safeguard of the rights of the defendant in case the jurors should ask questions tending to complicate the proceeding.

"So that if the district attorney has no further evidence to offer at this time, the gentlemen of the jury shall withdraw to the jury room while a recess is taken pending the arrival of the automobiles which are to carry us there. The members of the jury may now withdraw. . . ." (Tr. of the Ev., p. 172).

Notwithstanding the terms in which the ruling of the court is worded, Miss Veve did not confine herself to pointing out the various places to the jury but she was also examined as to matters which were foreign to the purpose of the view. See pp. 177, 178, and 179 of the transcript of the evidence. The witness Mariano Clavell, who found the cartridge introduced in evidence, was also examined. Section 258 of the Code of Criminal Procedure, with reference to the taking of a view prescribes:

"Sec. 258. *When, in the opinion of the court,* it is proper that the jury should view the place in which the offense is charged to have been committed, or in which any other material fact occurred, it may order the jury to be conducted in a body, in the custody of an officer to the place, which must be shown to them by a person appointed by the court for that purpose; and such officer must be sworn to suffer no person to speak or communicate with the jury, nor to do so himself, on any subject connected with the trial, and to return them into court without unnecessary delay, or at a specified time." (Italics ours.)

A view must be confined to pointing out to the jurors the various places mentioned or intended to be mentioned in the course of the evidence in order to thus facilitate a better understanding of the same. No witnesses should be examined, nor any arguments whatsoever made. It is incumbent on the judge which presides over the court and not on the

jury to determine as to the advisability of ordering a view. The law is silent as to any right on the part of the accused to be present when a view is taken. The Supreme Court of the United States, in the case of *Snyder* v. *Massachusetts,* 291 U. S. 97, 78 L. ed. 674, 90 A.L.R. 575, in an opinion delivered by Justice Cardozo, held that a view is not evidence, and that therefore a refusal to permit the defendant to be present at a view does not violate the constitutional clause of due process of law. We should state that in said case there was a dissenting opinion by Mr. Justice Roberts, in which Justices Brandies, Sutherland, and Butler concurred, wherein it was maintained that a view is equivalent to the taking of evidence, and that therefore the accused is entitled to be present when the same is being taken.

In our judgment, the better practice is to permit the accused to be present at the view, unless there should exist some reason to the contrary, as, for example, where the life of the accused is in danger if he attends the same. If the accused is present, he may call the attention of his counsel to any mistake made in pointing out the place or places in question, and may suggest to the latter any spot or place which the jury should inspect.

■ In the case at bar a view was not taken. Instead the court, as the judge stated (Tr. of Ev., p. 173), went to the Tricoche Hospital, and certain evidence was introduced then which was foreign to the view. Section 2 of the Organic Act guarantees to the accused in all criminal proceedings the right to be confronted with the witnesses against him, and in this case, if from the record it should affirmatively appear that he was not present, we would agree with him that he had been deprived of a constitutional right. But from the record it appears that the accused was present at the beginning of the trial, and that while the witnesses testified many of them referred to him, pointing him out as present in the courtroom. In these circumstances, and as there is no affirmative showing in the record that the defendant was not

present at the proceedings had in the Tricoche Hospital, the presumption in favor of the regularity of the proceedings arises, and hence it will be presumed that he was present during the so-called view. *State* v. *Clark*, 85 A.L.R. 502 (Wash. 1930); *State* v. *Costello*, 69 Pac. 1099 (Wash.); *Gaines* v. *Washington*, 277 U.S. 81 (1928), 72 L. ed. 793, where it was said:

"Then it is contended that the defendant was not personally present or was not in a place where he could hear the evidence. There is nothing in the record of the proceedings of the trial to support such a claim. No objection or exception was taken during the trial on this ground. It is based on affidavits filed in the case after the State Supreme Court had affirmed the conviction. This was much too late. *Frank* v. *Mangum*, 237 U. S. 309, 340."

See also 8 R.C.L. 95 and cases cited therein, and also, by analogy, that of *Franzeen* v. *Johnston, Warden*, 111 F. (2d) 817, 820.

■ The appellant complains that the court refused to permit Américo Delgado to testify as to facts which had occurred between him and the deceased on the night of December 31, 1935. It is perfectly clear that the fight between Martinó and Delgado, or the attack made by Martinó against Delgado, which gave rise to the arrest attempted to be made by the policeman Cordero, an arrest which was subsequently made by the defendant in the manner which we already know, could not in any way affect the crime committed by the latter, for the defendant does not claim that when he killed the deceased, he did so in defense of Delgado, and even assuming that Martinó had, without any justification, wounded Delgado, this fact would not have warranted the defendant in killing Martinó.

■ Nor did the court err in refusing to give the instructions on voluntary manslaughter. From the evidence it conclusively appears that at no time did Martinó attack the defendant. On the contrary, it was the latter who, without any legal justification, attacked him cruelly with his club,

notwithstanding the fact that the deceased offered to surrender in order to avoid being beaten. The defendant, however, urges that he killed him because he saw his fellow-officer Cordero in ward No. 1 bleeding from the wounds inflicted upon him by Martinó and that, as he was so very fond of Cordero, this produced in him a fit of anger which moved him to kill the deceased. Such a defense is untenable, for Cordero had arrived at the hospital before Martinó and the defendant had already been for half an hour or three quarters of an hour, guarding the deceased, and according to the whole evidence he was quiet, waiting for Martinó to receive medical attention in order to take him to jail. It was not until Berdecia told him: "If you don't kill hm, I will," that the defendant decided to commit the crime. The appearance of the deceased, covered as he was with blood from the wounds that the defendant had inflicted on him in a manner which was as unjustifiable as it was cruel, rather than produce in him a fit of anger, should have inspired in him profound remorse and compassion. Even conceding that Berdecia, as claimed by the defendant and some of his witnesses, had said to the accused: "If you do not kill him, I will kill you," and by virtue of that threat and believing his life to be in danger, the accused had then killed Martinó, in that case the crime committed by the accused would have been murder, and he could not at all allege that the killing had been done in self-defense. In this connection it is said in 3 Warren on Homicide, p. 170:

"Killing under Coercion.—Evidence that the defendant was commanded to commit the homicide by one who threatened to take his life if he refused, and, believing the threat would be executed, to save his own life, he killed the deceased, who was, when slain, a mile distant from the place where the threat was made, is sufficient to warrant a conviction of deliberate murder."

See also 8 R.C.L. 125, sec. 100 and the case of *State v. Weston,* 219 P. 180 (Ore., 1923), and authorities cited therein.

For the reasons stated the court would not have been justified in giving the instructions on voluntary manslaughter.

█ The appellant complains of the refusal of the court to subpoena the Director of the Insane Asylum at Río Piedras to appear at the trial bringing with him the record of the patient, Juana Sarria Pacheco, a sister of the defendant. The motion was belatedly made by the defendant at the close of all the evidence for the prosecution and for the defense in a trial which was quite long. In these circumstances, the trial court did not abuse its discretion in refusing to subpoena the Director of the Insane Asylum as the motion came too late, apart from the fact that we fail to see how the circumstance of having an insane sister could have benefited the defendant, when the only evidence on which he seeks to base his insanity is the nature of the acts done by him. But even so, from the record it appears that the court permitted the defendant to testify that he had a sister who had been confined in an insane asylum as a patient for about ten years, which allowed him to attain the same purpose that was sought by the testimony of the Director of the Insane Asylum.

Lastly, it can not be said that the trial court acted under the influence of passion, prejudice or partiality. If the court was remiss in anything, it was in being too lenient when it sentenced the defendant to a term of twelve years in the penitentiary in a case revealing so much cruelty on the part of the accused.

By virtue of the foregoing, the appeal must be overruled and the judgment appealed from affirmed.